EXHIBIT "C"



NATIONAL ELECTRICAL BENEFIT FUND

 

RESTATED EMPLOYEES BENEFIT AGREEMENT AND TRUST FOR THE NATIONAL ELECTRICAL BENEFIT FUND

*AND*

PLAN OF BENEFITS FOR THE NEBF

(January 1, 2000)



# RESTATED EMPLOYEES
# BENEFIT AGREEMENT AND TRUST
# FOR THE
# NATIONAL ELECTRICAL BENEFIT FUND
## (January 1, 2000)

# RESTATED EMPLOYEES BENEFIT AGREEMENT AND TRUST
## FOR THE NATIONAL ELECTRICAL BENEFIT FUND
### (January 1, 2000)

## TABLE OF CONTENTS

PREAMBLE............................................................................1
PART I—COLLECTIVE BARGAINING AGREEMENT....1
PART II—AGREEMENT AND DECLARATION OF TRUST....1

**1. Definitions** .................................................................1
Section 1.1   Act .......................................................1
Section 1.2   Agreement ..........................................1
Section 1.3   Association..........................................1
Section 1.4   Beneficiary..........................................1
Section 1.5   Brotherhood........................................1
Section 1.6   Code....................................................1
Section 1.7   Covered Employee..............................1
Section 1.8   Covered Employer..............................1
Section 1.9   Covered Employment...........................2
Section 1.10  Electrical Contractor...........................2
Section 1.11  Federal Tax Law..................................2
Section 1.12  Local Chapter.....................................2
Section 1.13  Local Union........................................2
Section 1.14  National Board or National Employees
              Benefit Board.....................................2
Section 1.15  National Board Co-chairmen...............2
Section 1.16  National Electrical Benefit Fund..........2
Section 1.17  NEBF.................................................2
Section 1.18  Participant...........................................2
Section 1.19  Party or Parties...................................2
Section 1.20  Plan ...................................................2
Section 1.21  Restated Employees Benefit Agreement or
              Restated Agreement............................2
Section 1.22  Trust ..................................................2
Section 1.23  Trustees..............................................2

**2. Trust Provisions of the National Electrical Benefit Fund..........2**
Section 2.1   Creation and Purpose..........................2
Section 2.2   Conformance to Law...........................2
Section 2.3   Situs of the NEBF................................3

**3. National Employees Benefit Board ..........................3**
Section 3.1   Creation and Purpose..........................3
Section 3.2   Number, Appointment, and Term.........3
Section 3.3   Resignation and Removal.....................3
Section 3.4   Successor National Board Members and
              Appointment......................................3
Section 3.5   Limitation of Liability of National Board
              Members............................................3
Section 3.6   Indemnification...................................3
Section 3.7   National Board Officers.......................3
Section 3.8   Power to Act in Case of Vacancy..........3
Section 3.9   National Board Meetings.....................3
Section 3.10  Attendance at Meetings and Minutes ....3
Section 3.11  Quorum, Voting, and Action without Meeting.... 3
Section 3.12  Manner of Acting in the Event of Deadlock..........4
Section 3.13  Powers and Duties of National Board............4

**4. Trustees...............................................................4**
Section 4.1   Number, Appointment, and Term .........4
Section 4.2   Resignation and Removal ....................5
Section 4.3   Successor Trustees and Appointment ....5
Section 4.4   Successor Trustee and Assumption of Office ....5
Section 4.5   Acceptance of the Trust by Trustees ....5
Section 4.6   Limitation of Liability of Trustees ........5
Section 4.7   Indemnification...................................5
Section 4.8   Officers ..............................................5
Section 4.9   Meetings and Notices ..........................5
Section 4.10  Attendance at Meetings and Minutes ....5
Section 4.11  Quorum, Voting, Action without Meeting,
              and Action by One Trustee.....................5
Section 4.12  Manner of Acting in the Event of Deadlock .... 5

**5. Powers and Duties of Trustees................................6**
Section 5.1   General Powers...................................6
Section 5.2   Funding Policy....................................6
Section 5.3   Conduct of NEBF Business .................6
Section 5.4   Payment of Expenses...........................6
Section 5.5   Providing Benefits...............................6
Section 5.6   Withdrawals from NEBF......................6
Section 5.7   Investments.........................................6
Section 5.8   Deposits and Disbursements................7
Section 5.9   Construction of the Agreement ............7
Section 5.10  Construction and Determinations With
              Regard to Plan...................................7
Section 5.11  Rules, Regulations, and Policies...........7
Section 5.12  Additional Authority............................7
Section 5.13  Surety Bonds......................................7
Section 5.14  Insurance............................................7
Section 5.15  Information to Participants and Beneficiaries......8
Section 5.16  Executive Secretary-Treasurer, Executive
              Director of Investments, and Other
              Employees.........................................8
Section 5.17  General Counsel.................................8
Section 5.18  Accountants and Actuaries..................8
Section 5.19  Appointment of Consultants and Advisers....8
Section 5.20  Office Space........................................8
Section 5.21  General Reports..................................8
Section 5.22  Records of Trustee Transactions...........8
Section 5.23  Studies and Statistics...........................8
Section 5.24  Reports to National Board....................8
Section 5.25  National Electrical Annuity Plan ..........8
Section 5.26  Liability..............................................8
Section 5.27  Reliance by Others.............................. 8
Section 5.28  Amendment of Agreement...................9
Section 5.29  Amendment of Plan.............................9

**6. Contributions and Collections.................................9**
Section 6.1   Covered Employer Contributions..........9
Section 6.2   3% of the Gross Labor Payroll.............9
Section 6.3   Coverage.............................................9
Section 6.4   Acceptance of Agreement.....................10
Section 6.5   NEBF's Designated Local Collection Agent.... 10
Section 6.6   Reports and Payments..........................11
Section 6.7   Production of Records..........................11
Section 6.8   Collection and Enforcement of Payments....11
Section 6.9   Collection Costs.................................. 11
Section 6.10  Effect of Non-Payment........................12
Section 6.11  Violation of Agreement........................12
Section 6.12  Refund of Contributions.......................12

**7. Termination of NEBF...........................................12**
Section 7.1   Conditions of Termination.................... 12
Section 7.2   Procedures in the Event of Termination....12
Section 7.3   Limitations..........................................12

**8. Miscellaneous.....................................................12**
Section 8.1   Termination of Covered Employer.........12
Section 8.2   Withdrawal of Covered Employers........12
Section 8.3   Vesting of Rights and Beneficial Interests....12
Section 8.4   Limitations Upon Beneficial Rights of
              Participants and Beneficiaries............. 13
Section 8.5   Judicial Settlements and Action by Trustees....13
Section 8.6   Withholding Payment...........................13
Section 8.7   Amendment of Part II of Agreement......13
Section 8.8   Indemnification....................................13
Section 8.9   Law Applicable...................................13
Section 8.10  Savings Clause....................................13
Section 8.11  Gender............................................... 13
Section 8.12  Part, Article and Section Titles.............13
Section 8.13  Effective Date.....................................13
Section 8.14  Grandfather Clause..............................13
Section 8.15  Name.................................................13

# RESTATED EMPLOYEES BENEFIT AGREEMENT AND TRUST FOR THE NATIONAL ELECTRICAL BENEFIT FUND

**WHEREAS**, the International Brotherhood of Electrical Workers and the National Electrical Contractors Association, Inc. (the "Parties") originally entered into the Employees Benefit Agreement ("Agreement") on September 3, 1946, for the purpose of providing retirement and related benefits to employees in the electrical contracting industry and employees in other branches of the electrical industry; and

**WHEREAS**, the Agreement has been amended several times since it was originally entered into and the Parties hereby desire to further amend it and to restate it; and

**WHEREAS**, among other matters, the present restatement and amendment shall revise the name of the Agreement to be the "Restated Employees Benefit Agreement and Trust," in order to reflect the fact that the Agreement has embodied, and will continue to embody, not only the Parties' collective bargaining agreement, but also, the basic agreement and declaration of trust for the National Electrical Benefit Fund; and

**WHEREAS**, the Parties recognize that while the program of benefits payable from the National Electrical Benefit Fund (the "NEBF") has heretofore been set forth in Article III-B and Appendix A of the Agreement, hereafter, by this restatement and further amendment to the Agreement, such benefits, while continuing to be paid by the NEBF, shall be set forth in a separate plan document entitled the "Plan of Benefits for the NEBF."

**NOW, THEREFORE**, in consideration of the premises and mutual covenants and agreements herein contained, it is hereby agreed as follows:

## PART I
## COLLECTIVE BARGAINING AGREEMENT

The Parties agree as follows:

**Provision 1.** The International Brotherhood of Electrical Workers and the National Electrical Contractors Association, Inc. have been and shall continue as plan sponsors of the NEBF and shall execute this Restated Employees Benefit Agreement and Trust for the NEBF.

**Provision 2.** This Agreement, including the collective bargaining agreement provisions, became effective on October 1, 1946, and has continued in effect thereafter on a calendar year basis. This Part I, constituting the Parties' collective bargaining agreement, shall continue in effect from year to year hereafter from January 1 to December 31 in each consecutive year, except as amended or terminated as provided below.

**Provision 3.** All collective bargaining agreements or other agreements covering construction employees entered into by the Brotherhood, or by any of its Local Unions, with Electrical Contractors (as such terms are defined in Sections 1.5, 1.13, and 1.10, respectively), shall, consistent with applicable law, require such Electrical Contractors to make contributions to the NEBF and to recognize and bind themselves to this Agreement.

**Provision 4.** Each Covered Employer (as defined in Section 1.8) shall contribute an amount equal to 3% of the gross labor payroll paid to, or accrued by, each Covered Employee (as defined in Section 1.7) as fully set forth in Part II of this Agreement.

**Provision 5.** The provisions of this Part I shall be subject solely to the joint interpretation of the Parties.

**Provision 6.**

(a) The provisions of this Part I shall be subject to revision or amendment solely by the Parties. Either party desiring to revise or amend the provisions in this Part I shall notify the other in writing at least ninety (90) days prior to January 1 of any year. The nature of the revision or amendment shall be specified in the notice. The provisions in this Part I may be revised or amended at any time by mutual consent of the Parties.

(b) This Part I shall be subject to termination solely by the Parties. Either Party desiring to terminate this Part I shall notify the other in writing at least ninety (90) days prior to January 1 of any year. This Part I may be terminated at any time by mutual consent of the Parties. This Part I shall terminate if the NEBF is terminated under Article 7 of Part II of this Agreement.

## PART II
## AGREEMENT AND DECLARATION OF TRUST

The Parties, as trustors, agree as follows:

## ARTICLE 1.  DEFINITIONS

The following capitalized terms when used herein, if not otherwise defined, shall have the following meanings:

**Section 1.1  Act.** "Act" means the Employee Retirement Income Security Act of 1974, any amendments as may from time to time be made and any lawful regulations promulgated pursuant to the provisions of the Act.

**Section 1.2  Agreement.** "Agreement" means the Employees Benefit Agreement, initially entered into by the Parties on September 3, 1946, as it has been amended, including the amendments and restatement effectuated by this instrument, and including all amendments and modifications as may from time to time be made hereafter.

**Section 1.3  Association.** "Association" means the National Electrical Contractors Association, Inc.

**Section 1.4  Beneficiary.** "Beneficiary" means a person other than a Participant who is or may become entitled to a benefit from the NEBF under the terms of the Plan.

**Section 1.5  Brotherhood.** "Brotherhood" means the International Brotherhood of Electrical Workers.

**Section 1.6  Code.** "Code" means the Internal Revenue Code of 1986, as amended.

**Section 1.7  Covered Employee.** "Covered Employee" means any employee of a Covered Employer with respect to whom the Covered Employer is obligated consistent with this Agreement to make contributions to the NEBF.

**Section 1.8  Covered Employer.** "Covered Employer" means:

**1.8.1** An employer who is a member of, or who is represent-

ed in collective bargaining by, the Association or one of its Local Chapters and who is bound by a collective bargaining agreement with the Brotherhood or a Local Union which provides for the making of payments to the NEBF with respect to any Covered Employee.

**1.8.2** An employer who is not a member of, nor represented in collective bargaining by, the Association or one of its Local Chapters, but who has executed, has assented to, or is bound by a collective bargaining agreement with the Brotherhood or a Local Union providing for the making of payments to the NEBF with respect to any Covered Employee.

**1.8.3** Such other employer to which the Trustees may extend the coverage of this Agreement upon such terms and conditions consistent with this Agreement as the Trustees shall determine, provided such employer agrees in writing to conform to the terms and conditions of this Agreement and such other terms and conditions as determined by the Trustees.

**1.8.4** An employer who does not meet the requirements of the definition of "Covered Employer" as stated in Sections 1.8.1, 1.8.2, or 1.8.3, but who is or will be making payments or contributions to the NEBF under any law, ordinance, or agreement applicable to or governing a State or Territory or any political subdivision or municipal corporation thereof, provided that the Brotherhood or Local Union enjoys the highest available form of recognition for the employees it represents and that the Trustees accept such participation upon such terms and conditions as the Trustees shall determine.

**Section 1.9 Covered Employment.** "Covered Employment" means employment by a Covered Employee for which a Covered Employer is obligated consistent with this Agreement to contribute to the NEBF.

**Section 1.10 Electrical Contractor.** "Electrical Contractor" means any individual or form of organization whose business is the erecting, installing, altering, repairing, servicing, or maintaining of electrical wiring devices, appliances, or equipment, including the purchasing from suppliers and the selling of manufactured parts and products.

**Section 1.11 Federal Tax Law.** "Federal Tax Law" means the Code, Treasury Regulations, and such other administrative or judicial rulings, notices, or other published guidance interpreting the Code or Treasury Regulations.

**Section 1.12 Local Chapter.** "Local Chapter" means any local association or group affiliated with the Association as a chapter.

**Section 1.13 Local Union.** "Local Union" means any local union affiliated with the Brotherhood.

**Section 1.14 National Board or National Employees Benefit Board.** "National Board" or "National Employees Benefit Board" means the National Employees Benefit Board as designated in this Agreement, with Brotherhood-appointed members sometimes hereafter referred to as "Brotherhood Members," Association-appointed members sometimes hereafter referred to as "Association Members," or otherwise, as the case may be (including "National Board Members" or "Members").

**Section 1.15 National Board Co-chairmen.** "National Board Co-chairmen" or "Co-chairmen" means the persons designated in this Agreement to serve as Co-chairmen of the National Employees Benefit Board.

**Section 1.16 National Electrical Benefit Fund.** "National Electrical Benefit Fund" means the employee benefit plan that is governed by this Agreement and comprises the entire trust estate governed by this Agreement as it may, from time to time, be constituted, including, but not limited to all funds received in the form of contributions, together with all contracts (including dividends, interest, refunds, and other sums payable to the Trustees on account of such contracts), all investments made and held by the Trustees, all income, increments, earnings and profits therefrom, and any and all other property or funds received and held by the Trustees by reason of their acceptance of this Agreement.

**Section 1.17 NEBF.** "NEBF" means the National Electrical Benefit Fund as defined herein.

**Section 1.18 Participant.** "Participant" means any person receiving a pension benefit from the NEBF, any person who has completed the requirements for a vested benefit from the NEBF, any person with credited service in the NEBF who has not lost all such credited service through a break in service, and any Covered Employee.

**Section 1.19 Party or Parties.** "Party" or "Parties" means the Brotherhood and/or the Association, as the case may be.

**Section 1.20 Plan.** "Plan" means the "Plan of Benefits for the NEBF," as provided in Section 3.13.2, including all amendments and modifications as may from time to time be made hereafter.

**Section 1.21 Restated Employees Benefit Agreement or Restated Agreement.** "Restated Employees Benefit Agreement" or "Restated Agreement" means the Agreement, as amended and restated herein, and including all amendments and modifications as may from time to time be made hereafter.

**Section 1.22 Trust.** "Trust" means the trust estate of the NEBF as provided in this Agreement.

**Section 1.23 Trustees.** "Trustees" means the Trustees designated in this Agreement.

## ARTICLE 2. TRUST PROVISIONS OF THE NATIONAL ELECTRICAL BENEFIT FUND

**Section 2.1 Creation and Purpose.** The trust estate for the NEBF was created and is continuing, as set forth herein, for the purpose of the NEBF providing such benefits as now are, or hereafter may be, authorized or permitted by law for Participants and their Beneficiaries and in accordance with the provisions herein set forth and in the Plan.

**Section 2.2 Conformance to Law.** The NEBF will conform to the applicable requirements of the Labor-Management Relations Act of 1947, as amended (known as the Taft-Hartley Act), and qualify as an "exempt trust" pursuant to Section 501(a) and other pertinent provisions of the Code.

2

**Section 2.3 <u>Situs of the NEBF</u>.** The situs of the NEBF's principal office and its trust estate shall, so long as such location is feasible, be the District of Columbia. The location of the administrative offices of the NEBF shall, so long as such location is feasible, be the State of Maryland.

# ARTICLE 3.   NATIONAL EMPLOYEES BENEFIT BOARD

**Section 3.1 <u>Creation and Purpose</u>.** A National Employees Benefit Board has been established by the Parties for the purposes set forth herein.

**Section 3.2 <u>Number, Appointment, and Term</u>.** The National Board shall consist of not less than eighteen (18) National Board Members equally divided between Members appointed by the Brotherhood and Members appointed by the Association. The National Board Members shall serve without compensation or allowances and at the will of the Party appointing them, but they shall be reimbursed by the NEBF for all reasonable and necessary expenses properly and actually incurred by them in connection with the performance of their official duties. National Board Members shall serve for such terms as their appointing Party may decide. Vacancy for any cause shall be filled by the respective appointing Party.

**Section 3.3 <u>Resignation and Removal</u>.** A National Board Member may resign and to the fullest extent allowed by applicable law become and remain fully discharged from all further duty or responsibility hereunder upon giving at least thirty (30) days' notice in writing to the National Board Co-chairmen (as identified in Section 3.7) and to the Party by whom he was appointed, or such shorter notice as the appointing Party may accept as sufficient, in which notice shall be stated a date on which such resignation shall take effect; and such resignation shall take effect on the date specified in the notice unless a successor National Board Member shall have been appointed at an earlier date, in which event such resignation shall take effect immediately upon the appointment of such successor National Board Member. A National Board Member may be removed by the appropriate appointing Party.

**Section 3.4 <u>Successor National Board Members and Appointment</u>.** If any National Board Member shall die, become incapable of acting hereunder, resign, or be removed, a successor National Board Member shall be designated by the appropriate appointing Party. It is the intention hereof that there shall, at all times, be an equal number of Members appointed by the Brotherhood and Members appointed by the Association. If either Party refuses to designate one or more necessary successor National Board Members within a reasonable period of time, either Co-chairman may petition the senior judge on duty of the District Court of the United States for the District of Columbia to appoint appropriate and necessary successor National Board Members.

**Section 3.5 <u>Limitation of Liability of National Board Members</u>.** No National Board Member shall be liable or responsible for his own acts or omissions, except as otherwise provided for by the Act or by other applicable law. No National Board Member shall be liable or responsible for the acts or omissions of any other National Board Member or of a Trustee, except as otherwise provided for by the Act or by other applicable law. No National Board Member shall be liable for the acts or omissions of any employee, investment manager, attorney, agent or assistant employed by the NEBF, except as otherwise provided for by

the Act or by other applicable law. No National Board Member shall in any way be liable or responsible for acts or omissions in the administration of the NEBF prior to the date of becoming a National Board Member. No National Board Member shall in any way be liable or responsible for acts or omissions in the administration of the NEBF subsequent to the date of the National Board Member's resignation or removal from the National Board.

**Section 3.6 <u>Indemnification</u>.** To the fullest extent permitted by the Act or applicable law, the National Board Members shall be indemnified by the NEBF as provided in any contract, agreement or policy duly executed or adopted pursuant to this Agreement.

**Section 3.7 <u>National Board Officers</u>.** The Trustees appointed by the respective Parties, who shall also serve on the National Board, shall serve as Co-chairmen of the National Board. Each Co-chairman shall have the right to appoint an alternate to act for him at any meeting of the National Board. The Secretary of the Trustees (as identified in Section 4.8), or such other person as the Secretary may designate, shall keep minutes and records of all meetings, proceedings and acts of the National Board, which shall be on file at the business address of each Co-chairman.

**Section 3.8 <u>Power to Act in Case of Vacancy</u>.** No vacancy or vacancies on the National Board shall impair the power of the remaining National Board Members to act in the manner provided by this Agreement.

**Section 3.9 <u>National Board Meetings</u>.** An annual meeting of the National Board shall be held within the first six (6) months of each calendar year on such date and at such place as the Co-chairmen may decide. Special meetings may be called by the Co-chairmen at any time on fifteen (15) days' notice mailed to each National Board Member. A meeting of the National Board may be held at any time without notice if all the National Board Members consent in writing.

**Section 3.10 <u>Attendance at Meetings and Minutes</u>.** All official meetings of the National Board shall be attended only by the National Board Members and such other persons as may be designated or invited by the Parties, the National Board, or the Trustees, and as may be otherwise required by law. Written minutes, which need not be verbatim, shall be kept. Such minutes shall be approved by the National Board at its next meeting.

**Section 3.11 <u>Quorum, Voting, and Action without Meeting</u>.**

**3.11.1** At least seven (7) Association Members and seven (7) Brotherhood Members of the National Board present in person at any meeting of the National Board shall constitute a quorum for the transaction of business. If at any meeting the number of Association Members and Brotherhood Members is unequal, then the group of National Board Members lesser in number shall be entitled to cast the same number of votes as the other group of National Board Members. If such Members shall be unable to agree as to the manner in which such additional vote or votes shall be cast, then action on the matter under consideration shall be postponed and resolved by mail vote (as provided in Section 3.11.3), cast within thirty (30) days of the meeting.

**3.11.2** Any action taken by the National Board Members,

except as herein otherwise provided, shall be by affirmative vote of a majority of the votes cast at a meeting. The National Board Members must cast their votes in person, except as provided herein.

**3.11.3** Action may be taken without any meeting only if all of the National Board Members agree in writing that a meeting is not required, if a mail vote under Section 3.11.1 or Section 3.12.2 is needed, or if the National Board is acting on the adoption of the Plan as provided under Section 3.13.2. In any such event, action on any proposition shall require the affirmative written vote of at least a majority of the total Members of the National Board. Such written vote shall be mailed to the NEBF's administrative offices and the Co-chairmen shall prepare a special written report reflecting the results of any such vote.

**Section 3.12** **Manner of Acting in the Event of Deadlock.**

**3.12.1** A deadlock shall be deemed to exist whenever a proposal, motion or resolution made or proposed by any one of the National Board Members, within the scope of the National Board's authority as set forth herein, results in a tie vote and the maker of the proposal, motion or resolution notifies the remaining National Board Members in writing that a deadlock exists.

**3.12.2** In the event of such notice of a deadlock, the Co-chairmen shall reduce the proposal, motion or resolution to writing and call for a mail vote within thirty (30) days of the notice of the deadlock. Such mail vote shall be governed by Section 3.11.3.

**3.12.3** In the event such deadlock continues after the completion of the mail vote, the Co-chairmen shall meet within thirty (30) days after the completion of the mail vote for the purpose of agreeing upon an impartial umpire to break such deadlock by deciding the dispute in question. In the event of the inability of the Co-chairmen to agree upon the selection or the procedure for selection of an impartial umpire, then, on the petition of either Co-chairman, the senior judge on duty of the District Court of the United States for the District of Columbia shall appoint an impartial umpire. The impartial umpire shall immediately proceed to hear the dispute between the National Board Members and decide such dispute, and the decision and award of the umpire shall be final and binding upon the National Board. The reasonable compensation of the umpire and costs and expenses (including, without limitation, attorneys' and reporter fees) incidental to any proceedings instituted to break a deadlock shall be paid by the NEBF.

**3.12.4** Any impartial umpire selected or designated to break a deadlock shall be required to enter his decision within a reasonable time fixed by the Co-chairmen. The scope of any such proceeding before such impartial umpire shall be limited to the provisions of Article 3 of this Agreement. The impartial umpire shall have no jurisdiction or authority to change or modify the provisions of this Agreement or to decide any issue arising under or involving any Article other than this Article 3 of this Agreement, nor shall any decision conflict or be inconsistent with the Act or applicable law.

**Section 3.13** **Powers and Duties of National Board.**

**3.13.1** The National Board when it meets annually, as provided in Section 3.9, shall review the NEBF's operations and administration and shall review the administration of the Plan. At this annual meeting, the National Board shall also hear and review a report from the Trustees.

**3.13.2** The National Board shall adopt a "Plan of Benefits for the NEBF" to be effective as of January 1, 1993 for the governance of the payment of retirement pension benefits, permanent disability pension benefits, and related benefits. Such adoption shall be by mail vote as provided in Section 3.11.3. Such Plan shall be a plan qualified under the Code, and shall continue as a qualified plan, so as to ensure that the Covered Employers' contributions to the NEBF are proper deductions for income tax purposes. Such Plan shall also at all times comply with any other applicable federal law and with the provisions of this Agreement.

**3.13.3** The National Board is authorized to revise or amend the provisions of Part II of this Agreement, except as provided in Section 5.28.

**3.13.4** The National Board is authorized to amend the Plan, provided, however, that amendments with regard to increases in benefits may only be made jointly by the National Board and the Trustees and, at the time of the adoption of the amendment, a report by the NEBF's actuary must indicate that in the actuary's opinion (a) no withdrawal liability then exists, and (b) upon its effective date, the amendment will not produce withdrawal liability for any Covered Employer. Withdrawal liability, as used herein, shall mean the circumstances whereby a withdrawing Covered Employer would actually incur withdrawal liability to the NEBF under the Act (and, more particularly, the provisions added by the Multiemployer Pension Plan Amendments Act of 1980).

**3.13.5** The National Board shall vote on any recommendations or proposals, within the scope of the National Board's authority, placed before it by the Trustees.

**3.13.6** The National Board shall have authority to act with regard to any termination of the NEBF, as provided in Article 7.

**3.13.7** The National Board shall make a full and complete report to the Association and the Brotherhood once each year of the National Board's actions during the prior year, which obligation may be fulfilled by transmitting a copy of the minutes of its annual meetings, or other meetings, or any special reports to the Parties.

# ARTICLE 4. TRUSTEES

**Section 4.1** **Number, Appointment, and Term.** There shall be two (2) Trustees who shall each be a "named fiduciary" as defined in Section 402(a)(2) of the Act. One (1) Trustee shall be appointed by the Association and one (1) Trustee shall be appointed by the Brotherhood. The Trustees shall serve without compensation or allowances and at the will of the Party appointing them, but they shall be reimbursed for all reasonable and neces-

4

sary expenses properly and actually incurred by them in connection with the performance of their official duties. Trustees shall serve for such terms as their appointing Party may decide. Vacancy from any cause shall be filled by the respective appointing Party. The Trustees shall also be appointed by their respective Parties as National Board Members and shall serve as Co-chairmen of the National Board.

**Section 4.2   Resignation and Removal.** A Trustee may resign and to the fullest extent allowed by applicable law become and remain fully discharged from all further duty or responsibility hereunder upon giving at least thirty (30) days' notice in writing to the remaining Trustee and to the Party by whom he was appointed, or such shorter notice as the appointing Party may accept as sufficient, in which notice shall be stated a date on which such resignation shall take effect; and such resignation shall take effect on the date specified in the notice unless a successor Trustee shall have been appointed at an earlier date, in which event such resignation shall take effect immediately upon the appointment of such successor Trustee. A Trustee may be removed by the appropriate appointing Party.

**Section 4.3   Successor Trustees and Appointment.** If any Trustee shall die, become incapable of acting hereunder, resign, or be removed, a successor Trustee shall be designated by the appropriate appointing Party. It is the intention hereof that there shall, at all times, be one (1) Trustee appointed by the Brotherhood and one (1) Trustee appointed by the Association and a vacancy in the Trustees shall preclude the remaining Trustee from taking any action pursuant to this Agreement. If one Party refuses to designate a successor Trustee within a reasonable period of time, the other Trustee may petition the senior judge on duty of the District Court of the United States for the District of Columbia to appoint an appropriate successor Trustee.

**Section 4.4   Successor Trustee and Assumption of Office.** Any successor Trustee shall, immediately upon his appointment as a successor Trustee and his acceptance of the Trusteeship in writing, as provided in Section 4.5, become vested with all the property rights, powers and duties of a Trustee hereunder with like effect as if originally named Trustee without the necessity of any formal conveyance or other instrument of title.

**Section 4.5   Acceptance of the Trust by Trustees.** The Trustees shall immediately meet and sign this Agreement as evidence of their acceptance of the Trust, their consent to act as Trustees, and their agreement to administer the Trust as provided herein. Successor Trustees shall execute a written acceptance in a form satisfactory to the Parties and consistent with the Act and thereby shall be deemed to have accepted the Trust, to have consented to act as Trustees, and to have agreed to administer the Trust as provided herein.

**Section 4.6   Limitation of Liability of Trustees.** No Trustee shall be liable or responsible for his own acts or omissions, except as otherwise provided for by the Act or by other applicable law. No Trustee shall be liable or responsible for the acts or omissions by any National Board Member or by the other Trustee, except as otherwise provided for by the Act or by other applicable law. Except as otherwise provided for by the Act or by other applicable law, no Trustee shall be liable for the acts or omissions of any employee, investment manager, attorney, agent or assistant employed by them, if such employee, investment manager, attorney, agent or assistant was selected pursuant to this Agreement and such person's performance was periodically reviewed by the Trustees who found such performance to be satisfactory; provid-

ed that nothing herein shall relieve any corporate trustee, if any, of any liability with regard to the performance of its employees. No Trustee shall in any way be liable or responsible for any act or omission in the administration of the NEBF prior to the date of becoming a Trustee. No Trustee shall in any way be liable or responsible for any act or omission in the administration of the NEBF subsequent to the date of the Trustee's resignation or removal as a Trustee.

**Section 4.7   Indemnification.** To the fullest extent permitted by the Act or applicable law, the Trustees shall be indemnified by the NEBF as provided in any contract, agreement or policy duly executed or adopted pursuant to this Agreement.

**Section 4.8   Officers.** The Trustee appointed by the Association shall serve as the Chairman of the Trustees and the Trustee appointed by the Brotherhood shall serve as the Secretary of the Trustees. The Secretary, or such other person as the Secretary may designate, shall keep minutes and records of all meetings, proceedings and acts of the Trustees and shall, with reasonable promptness, send copies of such minutes and records to the Trustees.

**Section 4.9   Meetings and Notices.** The Trustees shall meet monthly, as practicable, and a special meeting of the Trustees may be called by either one of the Trustees. All meetings shall be held on such date and at such place as the Trustees may decide.

**Section 4.10   Attendance at Meetings and Minutes.** All meetings of the Trustees shall be attended only by the Trustees and such other persons as may be designated or invited by the Trustees, and as may be otherwise required by law. Written minutes, which need not be verbatim, shall be kept by the Secretary or such other person as the Secretary may designate pursuant to Section 4.8, a copy of which shall be furnished to each Trustee. Such minutes shall be approved by the Trustees at a subsequent meeting.

**Section 4.11   Quorum, Voting, Action without Meeting, and Action by One Trustee.** Both Trustees must be present in person at any meeting of the Trustees. Any action taken by the Trustees, except as otherwise provided herein, shall be by the vote of both Trustees. Action by the Trustees may also be taken without a meeting if the Trustees agree thereon. Nothing herein shall preclude the Trustees from authorizing one Trustee to take any action, including the execution of any document on behalf of the Trustees and/or the NEBF, provided that such authorization is embodied in a writing or resolution signed by both Trustees, or is made by a motion adopted and reflected in the Trustees' minutes, and all persons, partnerships, corporations, or associations may rely thereupon that such document has been duly authorized and is binding on the NEBF and the Trustees.

**Section 4.12   Manner of Acting in the Event of Deadlock.**

4.12.1   A deadlock shall be deemed to exist whenever a proposal, motion or resolution made or proposed by one of the Trustees is not adopted by the other Trustee and the maker of the proposal, motion or resolution notifies the other Trustee in writing that a deadlock exists.

4.12.2   In the event of such deadlock arising, the Trustees shall meet within thirty (30) days of the written notice of deadlock for the purpose of reconsidering the proposal, motion or resolution, or, if such deadlock continues, of agreeing upon an impartial umpire to break such deadlock by deciding the dispute in question. In the event of the inability of the Trustees to agree upon the

selection or the procedure for selection of an impartial umpire at such meeting, then, on the petition of either Trustee, the senior judge on duty of the District Court of the United States for the District of Columbia shall appoint an impartial umpire. The impartial umpire shall immediately proceed to hear the dispute between the Trustees and decide such dispute, and the decision and award of the umpire shall be final and binding upon the Trustees. The reasonable compensation of the umpire and costs and expenses (including, without limitation, attorneys' and reporter fees) incidental to any proceedings instituted to break a deadlock shall be paid by the NEBF.

4.12.3 Any impartial umpire selected or designated to break a deadlock shall be required to enter his decision within a reasonable time fixed by the Trustees. The scope of any such proceeding before such impartial umpire shall be limited to the provisions of this Agreement relating to actions which may be undertaken by the Trustees. The impartial umpire shall have no jurisdiction or authority to change or modify the provisions of this Agreement or to decide any issue arising under or involving the interpretation of Part I of this Agreement or any provision of Part II of this Agreement unrelated to the Trustees, nor shall any decision conflict or be inconsistent with the Act or applicable law.

# ARTICLE 5.   POWERS AND DUTIES OF TRUSTEES

**Section 5.1   General Powers.** The Trustees are hereby empowered to do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary to accomplish the general objectives of maintaining the NEBF solely in the interests of the Participants and Beneficiaries for the exclusive purpose of (a) providing benefits to Participants and Beneficiaries, and (b) defraying reasonable expenses of administering the NEBF. Such actions shall be taken with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. Such actions shall include the diversification of the investments of the NEBF so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so. All such actions shall be in accordance with this Agreement and any documents or instruments governing the NEBF, insofar as they are consistent with applicable law.

**Section 5.2   Funding Policy.** The Trustees shall determine the short-term and long-term financial needs of the NEBF for the payment of pension and related benefits and the reasonable expenses of administering the NEBF.

**Section 5.3   Conduct of NEBF Business.** The Trustees shall have general supervision of the operation of the NEBF and shall conduct the business and activities of the NEBF in accordance with this Agreement and applicable law. The Trustees shall hold, manage and protect the Trust and collect the income therefrom and contributions thereto. The Trustees may, in the course of conducting the business of the NEBF, execute all documents in the name of the NEBF. Such documents shall be signed by both Trustees, unless one Trustee has authorized the other Trustee to sign any such document pursuant to Section 4.11.

**Section 5.4   Payment of Expenses.** The Trustees shall have

the power and authority to use and apply the NEBF assets to pay or provide for the payment of all reasonable and necessary expenses: (a) of collecting the Covered Employer contributions and payments and other moneys and property to which the NEBF may be entitled, and (b) of administering the affairs of the NEBF, including the employment of such administrative, legal, expert and clerical assistance, the purchase or lease of such premises, materials, supplies and equipment and the performance of such other acts, as the Trustees find necessary or appropriate in the performance of their duties.

**Section 5.5   Providing Benefits.** The Trustees shall have the power and authority to use and apply the Trust for the purpose of providing benefits and other conventional forms of retirement, disability and related benefits to eligible Participants and Beneficiaries in accordance with the terms, provisions and conditions of the "Plan of Benefits for the NEBF."

**Section 5.6   Withdrawals from NEBF.** Withdrawals from the Trust shall not be made for any purposes other than for payment of benefits to Participants and Beneficiaries and for the administration of the NEBF as provided herein.

**Section 5.7   Investments.**

5.7.1   **General.** The Trustees shall have full and exclusive authority and discretion to manage, control, invest, divest and hypothecate the assets of the NEBF in accordance with this Agreement and applicable law, except to the extent that such authority to manage, control, invest, divest and hypothecate the assets of the NEBF is delegated to one or more investment managers in accordance with Section 5.7.3.

5.7.2   **Commingled Funds.** Notwithstanding any other provision of this Agreement, the Trustees may cause any part or all of this Trust to be commingled with the money of trusts created by others. Money of this Trust so added to any commingled fund at any time shall be subject to all of the provisions of the declaration of trust creating said commingled fund, as it is amended from time to time. Said Declaration of Trust creating the commingled fund is hereby made a part of this Agreement.

5.7.3   **Investment Managers.** The Trustees shall have the power and authority to appoint one or more investment managers in accordance with Section 402(c)(3) of the Act, who shall be responsible for the management, acquisition, disposition, investing and reinvesting of such of the assets of the Trust as the Trustees shall specify. In accordance with Section 405(d)(1) of the Act, the Trustees shall not be liable for the acts or omissions of such investment manager nor have any investment obligation with respect to any asset managed by such manager. Any appointment of an investment manager may be terminated by the Trustees upon written notice, or as specified in written agreements with such managers. The fees of such investment manager and its expenses to the extent permitted by law shall be paid by the NEBF. Any such investment manager shall be a fiduciary who is either (a) registered as an investment manager under the Investment Advisers Act of 1940, (b) a bank, as defined in the Investment Advisers Act of 1940, (c) an insurance company qualified to perform investment management services under the laws of more than one state, or (d) such other

person or organization authorized by the Act. Such investment manager shall acknowledge in writing that he is a fiduciary with respect to the NEBF.

**5.7.4 Others.** The Trustees shall have the authority to allocate responsibilities and designate other persons to carry out certain responsibilities, as consistent with Section 405(c)(1) of the Act.

**5.7.5 Investment Guidelines.** The Trustees shall from time to time adopt appropriate investment policies and/or guidelines.

**Section 5.8 Deposits and Disbursements.** All NEBF monies not invested shall be deposited by the Trustees in such depository or depositories as the Trustees shall from time to time select, and any such deposit or deposits, or disbursements therefrom shall be made in the name of the NEBF in the manner designated by the Trustees and upon the signature(s) of persons designated and authorized by the Trustees or by an investment manager appointed in accordance with Section 5.7.3.

**Section 5.9 Construction of the Agreement.** The Trustees shall have full discretionary power and authority to construe and interpret the provisions of Part II of this Agreement, the terms used herein, and the rules, regulations and policies issued pursuant to Section 5.11. Any such construction or interpretation issued or confirmed in writing by the Trustees shall be binding upon the Brotherhood, the Association, the National Board, Local Unions, Local Chapters, Covered Employers, Covered Employees, and Participants and Beneficiaries and their families, dependents and/or legal representatives. Constructions or interpretations which are not issued or confirmed in writing by the Trustees shall not be binding upon the NEBF, and, in particular, no matter respecting the Trustees' rights herein or any difference arising thereunder shall be controlled or determined by the grievance or arbitration procedure established in any local collective bargaining agreement or by any construction by local collective bargaining parties.

**Section 5.10 Construction and Determinations With Regard to Plan.** The Trustees shall have full discretionary power and authority to construe and interpret the provisions of the Plan, the terms used therein, and the rules, regulations and policies related thereto. The Trustees shall have full, discretionary, and exclusive power and authority to administer the Plan and to determine all questions of coverage and eligibility, methods of providing or arranging for the benefits specified in the Plan and all other related matters. The Trustees shall not be under any obligation to pay any pension if the payment of such pension will result in loss of the NEBF's tax exempt status or qualified status under the applicable Federal Tax Law. Any such determination and any such construction or interpretation issued or confirmed in writing by the Trustees shall be final and binding upon the Brotherhood, the Association, the National Board, Local Unions, Local Chapters, Covered Employers, Covered Employees, and Participants and Beneficiaries and their families, dependents and/or legal representatives. Constructions or interpretations which are not issued or confirmed in writing by the Trustees shall not be binding upon the NEBF, and, in particular, no matter respecting the Trustees' rights herein or any difference arising thereunder shall be controlled or determined by the grievance or arbitration procedure established in any local collective bargaining agreement or by any construction or determination by local collective bargaining parties.

**Section 5.11 Rules, Regulations, and Policies.**

**5.11.1 Authority.** The Trustees are hereby empowered and authorized to promulgate, adopt and thereafter amend or rescind any and all necessary rules, regulations or policies which they deem needed or desirable to facilitate the proper administration of the NEBF, including the Plan. Said rules, regulations or policies may include, by way of illustration and not limitation: conditions of eligibility for Participants and Beneficiaries; procedures for applying for benefits; procedures for the distribution of benefits; indemnification of NEBF officials, fiduciaries, employees and service providers; and procedures for the collection of contributions. All such rules, regulations or policies adopted by action of the Trustees shall be binding upon the Brotherhood, the Association, the National Board, Local Unions, Local Chapters, Covered Employers, Covered Employees, and Participants and Beneficiaries and their families, dependents and/or legal representatives.

**5.11.2 Limitation.** No such regulation, rule or policy made or adopted by the Trustees shall conflict or be inconsistent with any provision of this Agreement, the Plan, the Act, or applicable law.

**Section 5.12 Additional Authority.** The Trustees are hereby empowered, in addition to such other powers as are set forth herein or conferred by law, and by way of illustration and not limitation:

**5.12.1** to enter into any and all contracts and agreements for carrying out the terms of this Agreement and for the administration of the NEBF, and to do all acts as they, in their discretion, may deem necessary or advisable;

**5.12.2** to investigate, file, litigate, compromise, settle, arbitrate, or release claims, suits, actions, proceedings or demands in favor of or against the NEBF or the Trustees on such terms and conditions as the Trustees may deem advisable;

**5.12.3** to make appropriate allocations of common administration expenses and disbursements shared or to be shared by the plans or funds administered by the Trustees pursuant to the provisions of this Agreement;

**5.12.4** to do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder;

**5.12.5** to do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper to accomplish the general objective of enabling the Covered Employees to obtain pension and related benefits in the most efficient and economical manner; and

**5.12.6** to do all acts which may be necessary to comply with any of the requirements of the Act or any other applicable law.

**Section 5.13 Surety Bonds.** Every fiduciary and every person who handles funds or other property of the NEBF shall be bonded by a duly authorized surety company in the amount fixed at the beginning of each fiscal year, which amount shall be consistent with Section 412 of the Act, but no bond shall be required by any corporation exempt from such bonding requirement pursuant to Section 412(a)(2) of the Act.

**Section 5.14 Insurance.** The Trustees may authorize the

purchase of insurance for the NEBF, for themselves collectively and/or individually, and for any other fiduciary employed by the Trustees, to cover liability or losses occurring by reason of the act or omission of a fiduciary and the cost of such insurance shall be paid by the NEBF; provided, however, that such insurance purchased by the NEBF must permit recourse by the insurer against the Trustee or other fiduciary in case of a breach of fiduciary obligation to the NEBF by such Trustee or other fiduciary. The Trustees or other fiduciary may purchase insurance containing a non-recourse option only as permitted under the Act and applicable law, and the premium for such options may not be paid from the NEBF unless permitted by the Act.

**Section 5.15   Information to Participants and Beneficiaries.**  The Trustees shall provide Participants and Beneficiaries such information as may be required by law.

**Section 5.16   Executive Secretary-Treasurer, Executive Director of Investments, and Other Employees.**  The Trustees shall engage the Executive Secretary-Treasurer and the Executive Director of Investments, to act as the Trustees may deem necessary, and such other employees as are needed and shall secure such special or regular services of others as the Trustees consider proper and shall pay out of the NEBF assets such salaries and expenses or operating overhead as the Trustees consider necessary.

**Section 5.17   General Counsel.**  The Trustees shall engage an attorney at law to act as General Counsel to the NEBF and to perform such legal services as the Trustees may deem necessary. To the fullest extent allowed by law, the Trustees shall not be liable for any action taken or omission suffered by them in good faith reliance upon the legal advice of such General Counsel.

**Section 5.18   Accountants and Actuaries.**  The Trustees shall engage one or more independent qualified public accountants and one or more enrolled actuaries to perform all services as may be required by applicable law and such other services as the Trustees may deem necessary.  The Trustees shall be fully protected with respect to any action taken or omission suffered by them in good faith reliance upon the advice of such accountant or actuary.

**Section 5.19   Appointment of Consultants and Advisers.**  The Trustees may engage a qualified consultant or consultants to serve the Trustees.  The Trustees may also engage a qualified adviser, as provided in Section 402(c)(2) of the Act, to render advice with regard to any Trustee responsibility under this Agreement.  The Trustees shall be fully protected with respect to any action taken or omission suffered by them in good faith reliance upon the advice of any such consultant or adviser.

**Section 5.20   Office Space.**  The Trustees are authorized to obtain whatever office space and equipment the Trustees deem necessary for the administration of the NEBF.

**Section 5.21   General Reports.**  All reports required by law to be signed by one or more Trustees shall be signed by both of the Trustees, unless one Trustee has authorized the other Trustee to sign such reports pursuant to Section 4.11.

**Section 5.22   Records of Trustee Transactions.**  The Trustees shall keep true and accurate books of account and a record of all of their transactions and meetings which records and books shall be audited annually by a certified public accountant.  A copy of the audit report shall be available for inspection by interested persons at the principal business office of the NEBF, and at the Brotherhood and the Association.

**Section 5.23   Studies and Statistics.**  The Trustees are authorized to secure and compile statistics regarding the number, age, health and employment records of employees in the electrical industry or in any of its branches and to make studies, including actuarial studies, based on such statistics as necessary and desirable to maintain suitable pension and related benefits.

**Section 5.24   Reports to National Board.**  The Trustees shall make a full and complete report annually to the National Board on their actions and the conditions of the monies under their charge.  Such report, including the annual audit, shall be available for inspection by interested persons at the principal business office of the NEBF, and at the Brotherhood and the Association. At any authorized meeting of the National Board, the Trustees shall also place before the National Board any recommendations or proposals, within the scope of the National Board's authority, to be acted upon by the National Board.

**Section 5.25   National Electrical Annuity Plan.**  The Trustees shall be authorized to enter into an agreement with the National Retirement Board of the National Electrical Annuity Plan to provide, by way of illustration and not limitation, personnel, services, space, and such other matters as may be necessary to administer the National Electrical Annuity Plan. Such agreement shall provide for reimbursement, consistent with generally accepted accounting principles, and consistent with applicable law, of all expenses incurred by the NEBF in providing for these matters.

**Section 5.26   Liability.**

5.26.1  **Reliance on Writings.**  The Trustees, to the extent permitted by applicable law, shall be fully protected and shall incur no liabilities in acting upon any instrument, certificate, application, notice, request, signed letter, telegram or other paper or document believed by them to be genuine, to contain a true statement of facts, and to be signed or presented by the proper person, and the Trustees shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

5.26.2  **Limitations on Liabilities of Parties.**  Neither the Brotherhood nor the Association shall in any way be liable under or because of this Agreement in any respect for any of the acts, omissions, or obligations of the Trustees or the National Board Members, individually or collectively.

**Section 5.27   Reliance by Others.**

5.27.1  **Entities.**  No entity dealing with the Trustees shall be obligated (a) to see the application to the stated NEBF purposes, of any funds or property of the Trust or (b) to see that the terms of this Agreement have been complied with or (c) to inquire into the necessity or expediency of any act of the Trustees.

5.27.2  **Instruments.**  Every instrument executed by both of the Trustees shall be conclusive evidence in favor of every person relying thereon (a) that at the time of execution of said instrument, the NEBF was a viable legal entity, (b) that the instrument was executed in accordance with the terms and conditions of this Agree-

ment, and (c) that the Trustees were duly authorized and empowered to execute the instrument.

**Section 5.28  Amendment of Agreement.** The Trustees are not authorized to amend this Agreement, except as provided herein. The Trustees are authorized to amend Part II of this Agreement, prospectively or retroactively, where they deem it necessary to maintain the continuation of the NEBF's tax exempt status under Federal Tax Law and to preserve compliance with the Act or other applicable law, and any regulations or rulings issued with respect thereto.

**Section 5.29  Amendment of Plan.** The Trustees are authorized to amend the Plan, prospectively or retroactively, where they deem it necessary to maintain the continuation of the NEBF's tax exempt status or the Plan's qualified status under Federal Tax Law or to otherwise preserve compliance with the Act or other applicable law, and any regulations or rulings issued with respect thereto. The Trustees are authorized to make whatever applications are necessary with the Internal Revenue Service to receive and maintain the determination of the qualified status of the NEBF and Plan. The Trustees are also generally authorized to amend the Plan, except where expressly limited as provided herein. Amendments with regard to increases in benefits may only be made jointly by the Trustees and the National Board and, at the time of the adoption of the amendment, a report by the NEBF's actuary must indicate that in the actuary's opinion (a) no withdrawal liability then exists, and (b) upon its effective date, the amendment will not produce withdrawal liability for any Covered Employer. Withdrawal liability, as used herein, shall mean the circumstances whereby a withdrawing Covered Employer would actually incur withdrawal liability to the NEBF under the Act (and, more particularly, the provisions added by the Multi-employer Pension Plan Amendments Act of 1980).

## ARTICLE 6.  CONTRIBUTIONS AND COLLECTIONS

**Section 6.1  Covered Employer Contributions.** Each Covered Employer shall pay by the fifteenth of each calendar month (except as provided herein) to the NEBF's designated local collection agent an amount equal to 3% of the gross labor payroll for the preceding calendar month paid to, or accrued by, the Covered Employees, as described in this Article. The Covered Employer agrees that such contributions shall constitute a legally binding, absolute obligation to the NEBF, and such obligation shall not be subject to set-off or counterclaim which the Covered Employer may have for any liability of the NEBF, the Brotherhood, a Local Union, the Association, any Local Chapter thereof, or any Covered Employee.

**Section 6.2  3% of the Gross Labor Payroll.** The term "3% of the gross labor payroll" shall mean:

6.2.1  as to Covered Employees who are in a bargaining unit represented by the Brotherhood or Local Union, 3% of all wages and other compensation paid to, or accrued by, the Covered Employees in the Brotherhood bargaining unit or the Local Union bargaining unit for services performed for the Covered Employer; or

6.2.2  as to Covered Employees who are not in a bargaining unit represented by the Brotherhood or Local Union, either (a) 3% of all wages and other compensation

which the Covered Employer would pay, or which the Covered Employees would accrue, if the Covered Employees were receiving the wage rate received by the highest number of employees in the appropriate Brotherhood bargaining unit or the Local Union bargaining unit and working the normal straight time hours provided for in the appropriate labor agreement, or (b) 3% of all wages and other compensation paid to, or accrued by, the Covered Employees for services performed for the Covered Employer, if such amount is less than in subsection (a).

6.2.3  the term "wages and other compensation" shall exclude: the value of non-cash fringe benefits; bona fide contributions made by the Covered Employer to: (a) a trust fund establishing under § 302(c) of the Taft-Hartley Act, or (b) a separate entity or fund which provides retirement benefits or medical benefits; and, bona fide bonuses of an extraordinary nature (i.e., lump sum year-end bonuses, not ordinarily paid as part of a regular payroll period).

## Section 6.3  Coverage.

6.3.1  Any Covered Employer who has agreed to contribute to the NEBF on behalf of the employees in a Brotherhood bargaining unit or a Local Union bargaining unit:

(a) shall contribute on behalf of each and every one of its employees in that Brotherhood bargaining unit or that Local Union bargaining unit;

(b) may contribute, either: (i) on behalf of all of its employees not in that Brotherhood bargaining unit or that Local Union bargaining unit (hereafter its "non-bargaining unit employees") provided that contributions are made on behalf of each and every such employee, including, without limitation all office clerical and other "overhead" employees; or, (ii) on behalf of each and every non-bargaining unit employee who meets the following conditions: the employee has earned at least one benefit service credit as defined in the "Plan of Benefits for the NEBF" and, during the current plan year or a prior plan year, at least one-half (1/2) of the employee's total hours of service for that year with any and all Covered Employers were performed in a Brotherhood bargaining unit or a Local Union bargaining unit ("alumni coverage"); and

(c) for purposes of coverage under (b)(i) and (b)(ii), need not contribute on behalf of employees who are included in another unit of employees covered by a collective bargaining agreement with a labor union, if retirement benefits were the subject of good faith bargaining between such Covered Employer and the labor union.

6.3.2  The Trustees shall permit related organizations (meaning the Brotherhood, Local Unions, the Association and its Local Chapters, joint apprenticeship and training committees, the NEBF, jointly administered trust funds providing health and welfare coverage, pensions, and pooled vacations, similar funds affiliated with the Brotherhood and/or the Association, and State or National Labor Federations or similar organizations in which the IBEW or a Local Union is a member or in

which NECA or a Local Chapter is a member) which so elect and which agree to satisfy the following conditions, to be Covered Employers. Such a related organization:

(a) shall contribute on behalf of each and every one of its employees; or, in the alternative,

(b) shall contribute on behalf of each and every employee who meets the following conditions: the employee has earned at least one benefit service credit as defined in the "Plan of Benefits for the NEBF" and, during the current plan year or a prior plan year, at least one-half (1/2) of the employee's total hours of service for that year with any and all Covered Employers were performed in a Brotherhood bargaining unit or a Local Union bargaining unit ("alumni coverage").

(c) However, if the related organization is a State or National Labor Federation or similar organization in which the IBEW or a Local Union is a member or in which NECA or a Local Chapter is a member, it shall select "alumni coverage."

(d) For purposes of coverage under (a), (b), and (c), any such related organization need not contribute on behalf of employees who are included in another unit of employees covered by a collective bargaining agreement with a labor union, if retirement benefits were the subject of good faith bargaining between such related organization and the labor union.

6.3.3    For any coverage permitted under Sections 6.3.1(b) and 6.3.2, each Covered Employer must:

(a) execute a written participation agreement as required by the Trustees which binds the Covered Employer to the terms of this Agreement and, thereby, specifies the detailed basis upon which the contributions are to be made to the NEBF;

(b) specify in its written participation agreement whether such Covered Employer is electing coverage of all non-bargaining unit employees or only "alumni coverage," which election, when made, cannot be changed to the other type of non-bargaining unit coverage without a new written participation agreement;

(c) for coverage under Sections 6.3.1(b)(i) and 6.3.2(a), certify in a manner acceptable to the Trustees that it is, in fact, covering all of its employees not in that Brotherhood bargaining unit or that Local Union bargaining unit, except those who may be excluded pursuant to Sections 6.3.1(c) and/or 6.3.2(d);

(d) for "alumni coverage," under Sections 6.3.1(b)(ii) and 6.3.2(b) and (c), certify in a manner acceptable to the Trustees that it is, in fact, covering all of its "alumni" employees, except those who may be excluded pursuant to Sections 6.3.1(c) and/or 6.3.2(d); and

(e) execute such documents as may be required by the Internal Revenue Service, or reasonably required by

the Trustees, to enable the NEBF to secure a determination letter of federal tax exemption or to support its tax exemption and/or qualified plan status.

6.3.4    In administering the types of coverages provided in this Section, the Trustees shall not permit any coverage inclusions or exclusions which would contravene the non-discrimination requirements of the Code and Federal Tax Law. The Trustees are authorized to take any and all steps as outlined herein and otherwise to ensure compliance with such Federal Tax Law requirements, including requiring a Covered Employer to retroactively include in its coverage one or more of its eligible employees who are not highly compensated employees and make contributions on behalf of such employee(s) in accordance with the terms of this Agreement, and such authority is expressly recognized by all Covered Employers which hereby agree to be bound by such actions.

**Section 6.4  Acceptance of Agreement.** Covered Employers shall, by the making of payments to the NEBF, be deemed to have accepted and be bound by this Agreement.

**Section 6.5  NEBF's Designated Local Collection Agent.**

6.5.1    The NEBF's designated local collection agent (herein referred to as the "local collection agent") may be designated in each locality or area over which a chapter chartered by the Association has jurisdiction, or in such area as the Trustees may designate. Local collection agents shall serve without compensation or allowances, but they shall be reimbursed as reasonable for expenses incurred in connection with the performance of their official duties. However, no expense shall be incurred without the prior approval of the Trustees. Local collection agents shall serve for such terms as the Trustees may decide. Each local collection agent shall be appointed, and may be removed, by the Trustees.

6.5.2    Each local collection agent shall be covered by a bond covering acts of fraud and dishonesty. The NEBF shall pay the premium on the bond and determine the amount in which it shall be written.

6.5.3    Each local collection agent shall be instructed and authorized by the Trustees as follows:

(a) to establish and maintain an interest-bearing checking account in the name of the NEBF into which contributions sent to the local collection agent shall be deposited;

(b) to collect from all Covered Employers in their jurisdiction the required contributions at the time and in the manner specified herein and to deposit those contributions in the interest-bearing checking account in a timely manner as instructed by the Trustees;

(c) to remit to the Trustees on or before the 25th day of each month all such contributions collected for the preceding month, all accrued interest from the checking account, and such other forms or reports as required by the Trustees;

(d) to act in strict accordance with all instructions and authority issued by the Trustees and such further

instructions and authority as the Trustees may decide, including instructions with respect to the compiling of statistics; and

(e) to act in strict conformity with this Agreement.

**6.5.4** Interpretations of this Agreement or of the Plan by a local collection agent shall not be binding on the NEBF or the Plan unless confirmed in writing by the Trustees.

**6.5.5** The authority and/or agency of local collection agents is strictly limited to collection of contributions as set forth herein and in the Plan and/or applicable NEBF rules, regulations or policies.

## Section 6.6 Reports and Payments.

**6.6.1** Covered Employers shall pay contributions to the local collection agent or to such depository as the Trustees shall designate, only by check or bank draft, made payable to the order of the NEBF, or such other method of transmitting money as the Trustees may permit. Except as provided herein, all contributions shall become a debt due and owing the NEBF on the last day of each month. The payment of contributions shall be made not later than fifteen (15) calendar days from the date on which the sum became a debt due and owing. All contributions shall be accompanied by a payroll report in such form as may be prescribed by the Trustees.

**6.6.2** If a Covered Employer's workforce did not perform any Covered Employment within a particular month, a payroll report shall nevertheless be filed as provided herein indicating that no Covered Employment was performed. Failure to do so shall subject the Covered Employer to liability for all fees and costs resulting from his failure to file such report.

## Section 6.7 Production of Records.

**6.7.1** Each Covered Employer shall promptly furnish to the Trustees or their authorized representative, on demand, (i) for each such Covered Employer's employees: their names, Social Security numbers, number of hours worked, gross labor payroll, earnings records, W-2s, and time cards, and (ii) for such Covered Employer: all Federal and State payroll or unemployment tax returns, cash disbursements journal, cash receipts journal, payroll journal, canceled payroll checks, other personnel records, other tax reports, corporate minutes, stock certificates or other evidence of ownership, and (iii) such other information as the Trustees may reasonably require in connection with the administration of the NEBF. The Trustees may, by their authorized representative, audit and examine the pertinent employment and payroll records of each Covered Employer, as described above, at the Covered Employer's place of business, whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the NEBF. The Brotherhood or Local Union shall, upon the request of the Trustees, promptly furnish information with respect to an employee's employment status.

**6.7.2** In addition, in the event the Covered Employer does not maintain or otherwise does not have in his possession records of the gross labor payroll paid to, or

accrued by, each employee, the Covered Employer agrees that for all types of coverage in order to determine the gross labor payroll for which contributions are required to be submitted to the NEBF, the number of hours of the employee shall be multiplied by the basic hourly wage scale set forth in the appropriate collective bargaining agreement.

**Section 6.8 Collection and Enforcement of Payments.** The Trustees shall have the power to demand, collect and receive Covered Employer payments and all other money and property to which the Trustees may be entitled, and shall hold the same until applied to the purposes provided in this Agreement. The Trustees shall be authorized to adopt and amend a collection (or delinquency) policy or procedure. They shall take such steps, including the institution and prosecution of, or the intervention in, such legal or administrative proceedings and the compromise, settlement, or release thereof as the Trustees determine to be in the best interest of the NEBF for the purpose of collecting such payments, money and property. The Trustees may also, where appropriate, join in the collection actions of other funds. No matter respecting the Trustees' rights herein shall, without their written consent, be compromised or settled under, or subject to, the grievance or arbitration procedure established in any local collective bargaining agreement, provided, however, that this provision shall not affect the rights and liabilities of any of the parties to each other under any such collective bargaining agreement.

**Section 6.9 Collection Costs.** In the event a Covered Employer has failed or fails to make required contributions, the Trustees are authorized and empowered:

**6.9.1** to impose on and receive from such Covered Employer all costs of any audit;

**6.9.2** to assess and receive from such Covered Employer as liquidated damages an amount up to twenty percent (20%) of the amount found to be delinquent, in that the failure of the Covered Employer to make the required payment of contributions imposes additional burden and expense upon the Trustees in the collection thereof, in the administration of the NEBF, including but not limited to the communication with said Covered Employer, and, in addition thereto may cause a loss of benefits to Covered Employees, all of which are difficult of accurate ascertainment;

**6.9.3** to assess and receive from such Covered Employer the lost interest from the delinquent amounts, to be calculated at a ten percent (10%) annual rate compounded monthly throughout the period of the delinquency;

**6.9.4** to impose on and receive from such Covered Employer any amounts the Trustees are required to pay for the benefit of an eligible Covered Employee of such Covered Employer, or a Covered Employee who would be eligible except for the failure of such Covered Employer to make required contributions on his behalf;

**6.9.5** to impose on and receive from such Covered Employer all costs, audit expenses, actuarial expenses, and attorneys fees incurred by the Trustees in enforcing the provisions hereof, whether by litigation or otherwise;

**6.9.6** to require such Covered Employer to make weekly deposits of contributions in an amount determined by the Trustees, based on objective standards, provided

that the Trustees have given such Covered Employer reasonable notice of such requirement for weekly deposits, the amount to be deposited, the date such deposits are due and the basis on which the weekly deposit is determined and required;

6.9.7  to require such Covered Employer to furnish to the Trustees a bond, with reputable surety thereon,

(a) with the Trustees as obligee thereunder,

(b) in an amount, determined by the Trustees, consistent with the anticipated future obligations of such Covered Employer, and

(c) with notice provisions acceptable to the Trustees consistent with purposes of such bond; and/or

6.9.8  to require such Covered Employer to furnish the Trustees an acceptable personal guaranty and/or irrevocable letter of credit.

**Section 6.10  Effect of Non-Payment.**  Non-payment by any Covered Employer of any contribution or other moneys owed to the NEBF shall not relieve any other Covered Employer from his or its obligation to make required payments to the NEBF.

**Section 6.11  Violation of Agreement.**  Failure of a Covered Employer to comply with this Agreement or with the rules regulations, or policies adopted by the Trustees shall constitute a violation of this Agreement and of the Covered Employer's collective bargaining agreement or other agreement with the Brotherhood or a Local Union, provided that neither the Association nor other Covered Employers shall be responsible for such violation.

**Section 6.12  Refund of Contributions.**  The NEBF will refund mistaken Covered Employer contributions that were paid to the NEBF within the year prior to the date the Trustees first became aware that the contributions were made in error.  Contributions paid to the NEBF more than one year prior to the date the Trustees first became aware that the contributions were made in error shall not be refundable.

# ARTICLE 7.  TERMINATION OF NEBF

**Section 7.1  Conditions of Termination.**  This Trust shall cease and terminate upon the happening of any one or more of the following events:

7.1.1  the Trust shall, in the opinion of the Trustees and the National Board, upon advice of the Trust's actuary, be inadequate to carry out the intent and purpose of this Agreement, or be inadequate to meet the payments due or to become due under this Agreement and under the Plan;

7.1.2  by written action of both of the Parties; or

7.1.3  as may be otherwise provided by law.

**Section 7.2  Procedures in the Event of Termination.**  In the event of termination, the Trustees shall, subject to National Board approval:

7.2.1  make provision for the payment out of the Trust of any and all obligations of the NEBF, including expenses incurred up to the date of termination of the Trust and the expenses incidental to such termination;

7.2.2  arrange for a final audit and report of their transactions and accounts, for the purpose of termination of their Trusteeship;

7.2.3  give any notice and prepare and file any reports which may be required by law; and

7.2.4  distribute the remaining assets among Participants and Beneficiaries in a manner and for a purpose as the Trustees deem proper and in accordance with applicable law.

**Section 7.3  Limitations.**  No part of the corpus or income of said Trust shall be used for, or diverted to, purposes other than for the exclusive benefit of the Participants and Beneficiaries and their families, dependents and/or legal representatives, or the administrative expenses of the Trust or for other payments in accordance with the provisions of this Agreement and the Plan. Under no circumstances shall any portion of the corpus or income of the NEBF, directly or indirectly, revert or accrue to the benefit of any Covered Employer, the Association, the Brotherhood, a Local Chapter, or a Local Union.

# ARTICLE 8.  MISCELLANEOUS

**Section 8.1  Termination of Covered Employer.**  A Covered Employer may, in the discretion of the Trustees, cease to be a Covered Employer and the Trustees may refuse to accept contributions and may deny prospective participation in the NEBF by the Covered Employer and its employees when the Trustees conclude that such participation is no longer in the best interests of the Participants and Beneficiaries of the NEBF or when such Covered Employer (a) is no longer obligated to make contributions to the NEBF; (b) is delinquent in contributions or reports to the NEBF; (c) fails upon request to furnish the NEBF with a copy of such Covered Employer's collective bargaining agreement or other written agreement requiring contributions to the NEBF; (d) agrees to a collective bargaining agreement or other written agreement, the terms of which the Trustees determine are not consistent with this Agreement or the Plan; or (e) fails to agree to be bound by the terms and provisions of this Agreement, and any amendments and modifications hereof.

**Section 8.2  Withdrawal of Covered Employers.**  Each Covered Employer agrees to notify the NEBF in writing should such Covered Employer cease to have an obligation to submit contributions to the NEBF, or if such Covered Employer conveys its assets to another party who does not have an obligation to contribute to the NEBF.  In the event such a conveyance of assets does occur, the conveying Covered Employer also agrees to provide the NEBF with the name, address and chief executive officer of the receiver of its assets.

**Section 8.3  Vesting of Rights and Beneficial Interests.**  The Trustees shall establish standards for vesting of benefits which conform to no less than minimum standards required by law.  No Covered Employee, Participant, Beneficiary, Covered Employer, Local Union, or other person shall have any vested interest or right, title, or other interest in or to the NEBF or any part thereof or any property of the NEBF, except as may be required by the Act or Code, be provided by the Trustees, or be specifically provided for in the Plan.  There shall be no pro rata or other distribution of any of the assets of the NEBF for any purpose or reason, except as required by law, as a result of any Local Union, Covered Employer or group of Covered Employers, Covered Employees, or Participants and their Beneficiaries, ceasing their participation in the NEBF.

**Section 8.4 Limitations Upon Beneficial Rights of Participants and Beneficiaries.** Except as required by law or pursuant to a qualified domestic relations order (a "QDRO") as defined in the Act and the Code, all benefits shall be free from the interference and control of any creditor of a Participant or Beneficiary, and no benefits shall be subject to any assignment or other anticipation, nor to seizure or to sale under any legal, equitable or any other process, and in the event that any claim or benefit shall, because of any debt incurred by or resulting from any other claim or liability against any Participant or Beneficiary, by reason of any sale, assignment, transfer, encumbrance, anticipation or other disposition made or attempted by said Participant or Beneficiary, or by reason of any seizure or sale or attempted sale under any legal, equitable or other process, or in any suit or proceeding become payable, or be liable to become payable to any person other than the Participant or Beneficiary for whom the same is intended, as provided herein and pursuant hereto, the Trustees shall have power to withhold payment of such benefit to such Participant or Beneficiary until such assignment, transfer, encumbrance, anticipation or other disposition, writ or legal process is canceled or withdrawn in such manner as shall be satisfactory to the Trustees. Until so canceled or withdrawn, the Trustees shall have the option to use and apply the benefits as the Trustees may deem best, directly for the support and maintenance of such Participant or Beneficiary.

**Section 8.5 Judicial Settlements and Action by Trustees.** The Trustees shall be entitled, at any time, to have a judicial settlement of their accounts and to seek judicial protection by any action or proceeding they determine necessary and, further, to obtain a judicial determination or declaratory judgment as to any question or construction of this Agreement or for instructions as to any action thereunder and, further, as to any question relating to the discharge of their duties and obligations under, or in connection with the administration of, this Agreement and as to the distribution of assets belonging to the NEBF. Any such determination, decision or judgment shall be binding upon all parties to, or claiming under, this Agreement.

**Section 8.6 Withholding Payment.** In the event any question or dispute shall arise as to the proper person or persons to whom any payments shall be made hereunder, the Trustees may withhold such payment until there shall have been made an adjudication of such question or dispute which is satisfactory to the Trustees, or until the Trustees shall have been fully protected against loss by means of such indemnification agreement or bond as they determine to be adequate.

**Section 8.7 Amendment of Part II of Agreement.** Except as provided in Section 5.28, the provisions of Part II shall be subject to revision or amendment by the National Board.

**Section 8.8 Indemnification.** To the fullest extent permitted by the Act or applicable law, the National Board Members, the Trustees, NEBF fiduciaries, NEBF employees and NEBF service providers shall be indemnified (both as to advances and reimbursements) by the NEBF, as may be provided in any contract, agreement, or policy duly executed or adopted as provided under this Agreement.

**Section 8.9 Law Applicable.** All questions pertaining to validity, construction and administration of the NEBF and of the acts and transactions with regard to the NEBF shall be determined in accordance with the laws of the District of Columbia, except as required by the Act.

**Section 8.10 Savings Clause.** Should any provision of this Agreement or in the Plan or in the rules, regulations or policies adopted pursuant to this Agreement be held to be unlawful or invalid, or unlawful or invalid as to any person or instance, such fact shall not adversely affect the other provisions herein or therein contained or the application of said provisions to any other person or instance, unless such unlawfulness or invalidity shall make impossible the functioning of the NEBF, and in such case the appropriate parties shall as quickly as practicable adopt a new provision to take the place of the unlawful or invalid provision.

**Section 8.11 Gender.** Whenever any words are used in this Agreement in the masculine gender, they shall also be construed to include the feminine or neuter gender in all situations where they would so apply and wherever any words are used in the plural, they shall also be construed to include the singular.

**Section 8.12 Part, Article and Section Titles.** The Part, Article and Section titles are included solely for convenience and shall, in no event, be construed to affect or modify any part of the provisions of this Agreement or be construed as part thereof.

**Section 8.13 Effective Date.** This Restated Agreement shall be effective as of January 1, 1993; provided that the authority given to the National Board under Sections 3.13.2 and 3.11.3 shall be effective upon the date of execution hereof. The National Board shall thereby, and then, be authorized to adopt the Plan, and such Plan shall be effective as of January 1, 1993.

**Section 8.14 Grandfather Clause.** This Restated Employees Benefit Agreement and Trust for the NEBF contains certain administrative or other provisions that may differ from provisions in prior Agreements. As a result, certain administrative forms and other documents may need to be modified. The Trustees shall make all necessary modifications to forms or other documents, as practicable, within a reasonable period of time. Until modified, such forms and documents shall be valid for all purposes and shall be construed in accordance with the administrative or other provisions of this Restated Agreement. Moreover, policies, explanations or interpretations previously adopted or issued by, or at the direction of, the National Board or the Trustees, may contain references to the Agreement or phraseology that may differ from this Restated Agreement; nevertheless, unless expressly modified or rescinded by the Trustees, those earlier policies, explanations or interpretations shall remain valid and shall be construed in accordance with this Agreement. In addition, certain phraseology in certain collective bargaining agreements or other agreements requiring Covered Employers to contribute to the NEBF may differ from certain phraseology of this Agreement, as restated. Such collective bargaining agreements or other agreements shall be deemed valid and binding for all purposes and shall be construed in accordance with the administrative or other provisions of this Agreement. All new collective bargaining agreements or other agreements or existing collective bargaining agreements or other agreements which are renewed or renegotiated on or after January 1, 1993 shall not be inconsistent with this Agreement.

**Section 8.15 Name.** This Restated Employees Benefit Agreement and Trust delineates this plan as the National Electrical Benefit Fund (or NEBF). Said name (or acronym) henceforth shall be the exclusive and the official reference to this plan. Nonetheless, the prior use of certain other names (or acronyms) for this plan (e.g., "Board of Trustees of the National Electrical Contractors Association Pension Benefit Trust Fund," "National Electrical Contractors Association Pension Benefit Trust Fund," "NECA/PBTF," "PBTF," "National Electrical Benefit Fund" or "NEBF") in contracts, agreements, and other documents or instru-

ments shall remain effective and valid, and shall be deemed to be a reference to the National Electrical Benefit Fund (or NEBF).

**IN WITNESS WHEREOF,** each of the Parties has caused this Restated Employees Benefit Agreement and Trust to be executed by its duly authorized officers this 2nd day of December, 1992, and the Trustees hereby sign this instrument for the reasons set forth herein.

Signed for the
National Electrical
Contractors Association, Inc.

Signed for the
International Brotherhood
of Electrical Workers

Trustee for the
National Electrical
Contractors Association, Inc.

Trustee for the
International Brotherhood
of Electrical Workers

# PLAN OF BENEFITS
# FOR THE NEBF

## (January 1, 2000)

# PLAN OF BENEFITS FOR THE NEBF
## (January 1, 2000)

## TABLE OF CONTENTS

1. Definitions ...................................................................1
  1.1  Act ........................................................................1
  1.2  Agreement ...........................................................1
  1.3  Association ...........................................................1
  1.4  Beneficiary ...........................................................1
  1.5  Benefit Service Credits ......................................1
  1.6  Brotherhood .........................................................1
  1.7  Code .....................................................................1
  1.8  Covered Employer ..............................................1
  1.9  Covered Employment .........................................1
  1.10  Disability Pension Benefit ...............................1
  1.11  Early Retirement Pension Benefit ..................1
  1.12  Federal Tax Law ...............................................1
  1.13  Hour of Service .................................................1
  1.14  Joint and Survivor Annuity Benefit ...............1
  1.15  Local Chapter ...................................................1
  1.16  Local Union .......................................................1
  1.17  National Board ..................................................2
  1.18  NEBF ..................................................................2
  1.19  Non-Covered Employment ..............................2
  1.20  Normal Retirement Age ....................................2
  1.21  Normal Retirement Pension Benefit ...............2
  1.22  Participant .........................................................2
  1.23  Past Service Credits .........................................2
  1.24  Pension Benefit .................................................2
  1.25  Plan .....................................................................2
  1.26  Related Organization ........................................2
  1.27  Retirement Pension Benefit ..............................2
  1.28  Trustees ..............................................................2
  1.29  Vested Pension ..................................................2
  1.30  Vesting Service Credits ....................................2
  1.31  Year ....................................................................2
2. Summary of Entitlement .........................................2
3. Eligibility for Participation ....................................2
4. Benefit Service Credits ...........................................2
  4.1  Service Prior to 1965 ........................................2
  4.2  Service During 1965 and Thereafter ...............2
  4.3  First Year Rule ..................................................2
  4.4  Past Service Credits .........................................2
  4.5  Military Service .................................................2
5. Vesting Service Credits ...........................................3
  5.1  Service Prior to 1965 ........................................3
  5.2  Service During 1965 and Thereafter ...............3
  5.3  First Year Rule ..................................................3
  5.4  Non-Covered Employment ..............................3
  5.5  Past Service Credits .........................................3
  5.6  Military Service .................................................3
  5.7  Maternity and Paternity Leave .........................3
6. Vested Pension ........................................................3
7. Past Service Credits ................................................3
  7.1  Maximum Credits .............................................4
  7.2  One to One Rule ................................................4
  7.3  Covered Employer Requirement ......................4
  7.4  Occupational Classifications ...........................4
  7.5  Breaks in Service ..............................................4
  7.6  Employer Out of Business ................................4
8. Loss of Prior Benefit and Vesting Service ............4
  8.1  Break in Service Rules .....................................4
  8.2  Periods of Time Not Considered a Break in Service ...........4
  8.3  Exception for Vested Pension ..........................5
9. Eligibility, Amount, and Method of Payment of Normal
Retirement Pension Benefit ....................................5

  9.1  Eligibility ..........................................................5
  9.2  Amount ..............................................................5
  9.3  Method of Payment ..........................................5
10. Eligibility, Amount, and Method of Payment of Early
Retirement Pension Benefit ...................................5
  10.1  Eligibility ........................................................5
  10.2  Amount ............................................................5
  10.3  Method of Payment ........................................6
11. Eligibility, Amount, and Method of Payment of Disability
Pension Benefit .....................................................6
  11.1  Eligibility ........................................................6
  11.2  Amount ............................................................6
  11.3  Method of Payment ........................................6
12. Pension Calculations .............................................6
  12.1  Basic Rule .......................................................6
  12.2  Pension Rates ..................................................6
  12.3  Applicable Pension Rate .................................6
  12.4  Less than 3% ...................................................7
13. Effective Date of Pension Benefits ......................7
  13.1  Normal Retirement Pension Benefit ..............7
  13.2  Early Retirement Pension Benefit ..................7
  13.3  Disability Pension Benefit ..............................7
  13.4  Retroactive Payments .....................................8
14. Commencement of the Payment of Pension Benefits ............8
  14.1  Retirement Pension Benefits ..........................8
  14.2  Disability Pension Benefits ............................8
  14.3  Age 70 1/2 .......................................................8
15. Return to Work ......................................................8
  15.1  Suspension of Retirement Pension Benefits ..........8
  15.2  Return to Employment While on Disability ..........8
  15.3  Subsequent Application for Benefits ..............8
16. Joint and Survivor Annuity Benefit .....................8
  16.1  Eligibility for Joint and Survivor Annuity Benefit ..........8
  16.2  Election Against Joint and Survivor Annuity Benefit ...........9
  16.3  Amount and Payment of Joint and Survivor Annuity Benefit .....9
17. Pre-Retirement Surviving Spouse Benefit ...........10
  17.1  Death On or After Age 62 .............................10
  17.2  Death Prior to Age 62 ...................................10
18. Maximum Benefit .................................................10
19. Construction and Determinations with Regard to Plan ..........10
20. Claims Procedures ................................................10
  20.1  Application ....................................................10
  20.2  Processing of Application .............................11
  20.3  Denial of Application ...................................11
  20.4  Appeal ...........................................................11
  20.5  Decision on Appeal ......................................11
21. Rules, Regulations, and Policies .........................11
22. Contributions ........................................................11
  22.1  Payment of Contributions ............................11
  22.2  Refund of Contributions ...............................11
23. Limitations Upon Beneficial Rights and Interests ...............11
24. Withholding Payment ...........................................12
25. Overpayments and Mistaken Payments ...............12
26. Anti-Reversion Provision .....................................12
27. No Divestiture ......................................................12
28. Termination or Merger of NEBF .........................12
29. Gender and Plural Usages ....................................12
30. Section Titles .......................................................12
31. Savings Clause .....................................................12
32. Amendment of Plan ..............................................12
33. Applicable Plan or Agreement .............................12

The National Electrical Benefit Fund (the "NEBF") has been in existence since September 3, 1946, for the purpose of providing retirement and related benefits to employees in the electrical contracting industry and employees in other branches of the electrical industry. The provisions governing the rules and procedures for the payment of retirement and related benefits have been previously contained in Article III-B and Appendix A of the Employees Benefit Agreement entered into by the International Brotherhood of Electrical Workers and the National Electrical Contractors Association, Inc. (the "Parties"). Pursuant to Section 3.13.2 of the Restated Employees Benefit Agreement and Trust, the National Employees Benefit Board was authorized by the Parties to adopt a distinct document entitled the "Plan of Benefits for the NEBF." Accordingly, the following Plan of Benefits for the NEBF was adopted by the National Employees Benefit Board to be effective on January 1, 1993, and as duly amended thereafter.

## PLAN OF BENEFITS FOR THE NEBF

1. **DEFINITIONS**. The following capitalized terms when used herein, if not otherwise defined, shall have the following meanings:

1.1 **Act.** "Act" means the Employee Retirement Income Security Act of 1974, any amendments as may from time to time be made and any lawful regulations promulgated pursuant to the provisions of the Act.

1.2 **Agreement.** "Agreement" means the Employees Benefit Agreement, initially entered into by the Brotherhood and the Association on September 3, 1946, as it has been amended and restated and delineated as the Restated Employees Benefit Agreement and Trust, including all amendments and modifications as may from time to time be made.

1.3 **Association.** "Association" means the National Electrical Contractors Association, Inc.

1.4 **Beneficiary.** "Beneficiary" means a person other than a Participant who is or may become entitled to a Pension Benefit from the NEBF under the terms of the Plan.

1.5 **Benefit Service Credits.** "Benefit Service Credits" mean the credits (accrued as set forth in Section 4) upon which a Participant's Pension Benefit shall be based.

1.6 **Brotherhood.** "Brotherhood" means the International Brotherhood of Electrical Workers.

1.7 **Code.** "Code" means the Internal Revenue Code of 1986, as amended.

1.8 **Covered Employer.** "Covered Employer" means:

(a) An employer who is a member of, or who is represented in collective bargaining by, the Association or one of its Local Chapters and who is bound by a collective bargaining agreement with the Brotherhood or a Local Union which provides for the making of payments to the NEBF with respect to any employee.

(b) An employer who is not a member of, nor represented in collective bargaining by, the Association or one of its Local Chapters, but who has executed,

has assented to, or is bound by a collective bargaining agreement with the Brotherhood or a Local Union providing for the making of payments to the NEBF with respect to any employee.

(c) Such other employer to which the Trustees may extend the coverage of the Agreement upon such terms and conditions consistent with the Agreement as the Trustees shall determine, provided such employer agrees in writing to conform to the terms and conditions of the Agreement and such other terms and conditions as determined by the Trustees.

(d) An employer who does not meet the requirements of the definition of "Covered Employer" as stated in subsections (a), (b), or (c) of this Section, but who is or will be making payments or contributions to the NEBF under any law, ordinance, or agreement applicable to or governing a State or Territory or any political subdivision or municipal corporation thereof, provided that the Brotherhood or Local Union enjoys the highest available form of recognition for the employees it represents and that the Trustees accept such participation upon such terms and conditions as the Trustees shall determine.

1.9 **Covered Employment.** "Covered Employment" means employment of an employee for which a Covered Employer is obligated consistent with the Agreement to contribute to the NEBF.

1.10 **Disability Pension Benefit.** "Disability Pension Benefit" means a Disability Pension Benefit as set forth in Section 11.

1.11 **Early Retirement Pension Benefit.** "Early Retirement Pension Benefit" means an Early Retirement Pension Benefit as set forth in Section 10.

1.12 **Federal Tax Law.** "Federal Tax Law" means the Code, Treasury Regulations, and such other administrative or judicial rulings, notices, or other published guidance interpreting the Code or Treasury Regulations.

1.13 **Hour of Service.** "Hour of Service" means an hour of service for which an employee is paid, or entitled to payment, for the performance or non-performance of duties, or an hour for which back pay, regardless of mitigation of damages, is either awarded or agreed to by the employer. Hours of Service shall be further computed and credited in accordance with Department of Labor Regulation § 2530.200b-2. Overtime Hours of Service shall be the actual hours worked and shall be computed on a non-multiple basis, without reference to any premium rate.

1.14 **Joint and Survivor Annuity Benefit.** "Joint and Survivor Annuity Benefit" means a Joint and Survivor Annuity Benefit as set forth in Section 16.

1.15 **Local Chapter.** "Local Chapter" means any local association or group affiliated with the Association as a chapter.

1.16 **Local Union.** "Local Union" means any local union affiliated with the Brotherhood.

**1.17 National Board.** "National Board" means the National Employees Benefit Board, as set forth in the Agreement.

**1.18 NEBF.** "NEBF" means the National Electrical Benefit Fund, which is the employee benefit plan that is governed by the Agreement and this Plan and comprises the entire trust estate governed by the Agreement as it may, from time to time, be constituted.

**1.19 Non-Covered Employment.** "Non-Covered Employment" means employment of an employee for which an employer is not obligated consistent with the Agreement to contribute to the NEBF.

**1.20 Normal Retirement Age.** "Normal Retirement Age" means age sixty-five (65).

**1.21 Normal Retirement Pension Benefit.** "Normal Retirement Pension Benefit" means a Normal Retirement Pension Benefit as set forth in Section 9.

**1.22 Participant.** "Participant" means any person receiving a Retirement Pension Benefit or Disability Pension Benefit from the NEBF, any person who has completed the requirements for a Vested Pension, any person with Benefit Service Credits or Vesting Service Credits who has not lost all such credits through a break in service (as provided in Section 8.1), and any employee employed consistent with the Agreement in Covered Employment.

**1.23 Past Service Credits.** "Past Service Credits" mean the credits a Participant may accrue (as set forth in Section 7) for service with an employer prior to the Participant's Covered Employment. Such Past Service Credits shall apply as Benefit and Vesting Service Credits.

**1.24 Pension Benefit.** "Pension Benefit" means a Retirement Pension Benefit or Disability Pension Benefit.

**1.25 Plan.** "Plan" means the "Plan of Benefits for the NEBF", including all amendments and modifications as may from time to time be made.

**1.26 Related Organization.** "Related Organization" means the Brotherhood, Local Unions, the Association and its Local Chapters, Joint Apprenticeship and Training Committees, the NEBF, jointly administered trust funds providing health and welfare coverage, pensions, pooled vacations, and similar funds affiliated with the Brotherhood and/or the Association.

**1.27 Retirement Pension Benefit.** "Retirement Pension Benefit" means a Normal Retirement Pension Benefit as set forth in Section 9 or an Early Retirement Pension Benefit as set forth in Section 10.

**1.28 Trustees.** "Trustees" means the Trustees designated in the Agreement.

**1.29 Vested Pension.** "Vested Pension" means a nonforfeitable right to a Pension Benefit as set forth in Section 6.

**1.30 Vesting Service Credits.** "Vesting Service Credits" mean the credits (accrued as set forth in Section 5) upon which a Participant's entitlement to a Vested Pension is based.

**1.31 Year.** "Year" means calendar year.

**2. SUMMARY OF ENTITLEMENT.** A Participant who has accrued Benefit Service Credits (as set forth in Section 4) and who has accrued sufficient Vesting Service Credits (as set forth in Section 5) to be entitled to a Vested Pension (as set forth in Section 6), shall, consistent with this Plan, be entitled to a Normal Retirement Pension Benefit (as set forth in Section 9), an Early Retirement Pension Benefit (as set forth in Section 10), or a Disability Pension Benefit (as set forth in Section 11), payable for the period of his life or the period of his disability or payable as a Joint and Survivor Annuity Benefit (as set forth in Section 16).

**3. ELIGIBILITY FOR PARTICIPATION.** An employee shall become a Participant in the NEBF upon the performance of Covered Employment. There are no minimum age or service requirements for participation. An employee shall cease to be a Participant upon the loss of his Vesting Service Credits as provided in Section 8.

**4. BENEFIT SERVICE CREDITS.** A Participant shall be credited with Benefit Service Credits in the following manner:

**4.1 Service Prior to 1965.** A Participant shall be credited with one (1) Benefit Service Credit for each Year in which the Participant performed any Covered Employment during the period 1947 through and including 1964.

**4.2 Service During 1965 and Thereafter.** A Participant shall be credited with one (1) Benefit Service Credit for each one thousand (1000) Hours of Service of Covered Employment performed during the period 1965 and thereafter, provided that: (a) for purposes of this subsection, Hours of Service of Covered Employment shall not include any Hours of Service earned during a Year in which such Hours of Service did not equal or exceed three hundred (300) Hours of Service of Covered Employment; and (b) the Benefit Service Credits computed under this subsection shall not exceed the aggregate number of Years in which the Participant earned Hours of Service of Covered Employment equal to or exceeding three hundred (300) such Hours of Service during the period 1965 and thereafter.

**4.3 First Year Rule.** Notwithstanding the three hundred (300) Hours of Service requirements of Section 4.2, if (a) the first Year in which contributions are made on the Participant's behalf is 1976 or thereafter, or (b) the first Year in which contributions are made on the Participant's behalf after a loss of prior service credits (pursuant to Section 8) is 1976 or thereafter, the Hours of Service in such Year shall be included in the calculation of a Benefit Service Credit and the first Year shall be included in the aggregate number of Years governing the maximum Benefit Service Credits under Section 4.2.

**4.4 Past Service Credits.** A Participant shall be credited with one (1) Benefit Service Credit for each earned Past Service Credit (as provided in Section 7).

**4.5 Military Service.** On or after January 1, 1993, a Participant who leaves Covered Employment for the reason of entering military service for the first time or being recalled to such military service, under the laws of the United States, shall be, for purposes of Section 4.2, credited with eighty-three and one third (83 1/3) Hours of Service of Covered Employment for each month during the term of such military service plus the length of time taken to return to Covered Employment or Non-Covered Employment as defined in Section 5.4. No Benefit Service Credits shall be granted, however, if the Par-

ticipant does not perform any Covered Employment, or Non-Covered Employment as defined in Section 5.4, within three (3) months following the date of discharge or release from military service. Further, no Benefit Service Credits shall be granted if the Participant remains in military service beyond his first term of service or beyond the period of recall. Military service prior to January 1, 1993, shall be governed by the Agreement in effect in 1992 and the rules regarding military service in the Agreement in effect in 1992 are expressly adopted by reference herein.

**5. VESTING SERVICE CREDITS.** A Participant's entitlement to a Vested Pension is determined by computing the number of Vesting Service Credits the Participant has accrued at the time of retirement or disability. Vesting Service Credits are accrued in the following manner:

**5.1 Service Prior to 1965.** A Participant shall be credited with one (1) Vesting Service Credit for each Year in which the Participant performed any Covered Employment during the period 1947 through and including 1964.

**5.2 Service During 1965 and Thereafter.** A Participant shall be credited with one (1) Vesting Service Credit for each one thousand (1000) Hours of Service of Covered Employment performed during the period 1965 and thereafter, provided that: (a) for purposes of this subsection, Hours of Service of Covered Employment shall not include any Hours of Service earned during a Year in which such Hours of Service did not equal or exceed three hundred (300) Hours of Service of Covered Employment; and (b) the Vesting Service Credits computed under this subsection shall not exceed the aggregate number of Years in which the Participant earned Hours of Service of Covered Employment equal to or exceeding three hundred (300) such Hours of Service during the period 1965 and thereafter.

**5.3 First Year Rule.** Notwithstanding the three hundred (300) Hours of Service requirements of Section 5.2, if (a) the first Year in which contributions are made on the Participant's behalf is 1976 or thereafter, or (b) the first Year in which contributions are made on the Participant's behalf after a loss of prior service credits (pursuant to Section 8) is 1976 or thereafter, the Hours of Service in such Year shall be included in the calculation of a Vesting Service Credit and the first Year shall be included in the aggregate number of Years governing the maximum Vesting Service Credits under Section 5.2.

**5.4 Non-Covered Employment.** A Participant who has previously worked in Covered Employment shall be entitled to one (1) Vesting Service Credit for (a) each Year in which the Participant performed any Non-Covered Employment for a Covered Employer or Related Organization prior to 1965, and (b) each Year in which the Participant worked for three hundred (300) or more Hours of Service in such Non-Covered Employment for a Covered Employer or Related Organization during 1965 or thereafter.

**5.5 Past Service Credits.** A Participant shall be credited with one (1) Vesting Service Credit for each earned Past Service Credit (as provided in Section 7).

**5.6 Military Service.** On or after January 1, 1993, a Par-

ticipant who leaves Covered Employment, or Non-Covered Employment as defined in Section 5.4, for the reason of entering military service for the first time or being recalled to such military service, under the laws of the United States, shall be, for purposes of Section 5.2, credited with eighty-three and one third (83 1/3) Hours of Service of Covered Employment for each month during the term of such military service plus the length of time taken to return to Covered Employment or Non-Covered Employment as defined in Section 5.4. No Vesting Service Credits shall be granted, however, if the Participant does not perform any Covered Employment, or Non-Covered Employment as defined in Section 5.4, within three (3) months following the date of discharge or release from military service. Further, no Vested Service Credits shall be granted if the Participant remains in military service beyond his first term of service or beyond the period of recall. Military service prior to January 1, 1993, shall be governed by the Agreement in effect in 1992 and the rules regarding military service in the Agreement in effect in 1992 are expressly adopted by reference herein.

**5.7 Maternity and Paternity Leave.** A Participant who would otherwise not be entitled to include a Year in the calculation of a Vesting Service Credit under Section 5.2 or Section 5.4 because of a failure to work for three hundred (300) or more Hours of Service in such Year where such failure was the direct result of the happening of one of the following events: (a) the pregnancy of the Participant; (b) the birth of the Participant's child; (c) the adoption of a child by the Participant; or (d) the provision of child care during the period immediately following the birth of the Participant's child or the adoption by the Participant, shall be entitled to:

**(a)** include the Hours of Service that could otherwise have been performed into the calculation of a Vesting Service Credit under Section 5.2 where the happening of the event precluded Covered Employment under Section 5.2; or

**(b)** a Vesting Service Credit where the happening of the event precluded Non-Covered Employment under Section 5.4.

In no event shall a Participant be entitled to more than one (1) Vesting Service Credit per event.

**6. VESTED PENSION.** Effective January 1, 1988, a Participant shall be entitled to a Vested Pension by accruing five (5) or more Vesting Service Credits (pursuant to Section 5) before losing such Vesting Service Credits due to a break in service (pursuant to Section 8). Moreover, a Participant who has any Benefit Service Credits which have not been lost due to a break in service (pursuant to Section 8), shall have a nonforfeitable right to a Pension Benefit upon attainment of Normal Retirement Age. Notwithstanding the above, the NEBF has, in the past, had differing requirements for the attainment of a Vested Pension and the prior, applicable Agreement shall govern a Participant's right to a Vested Pension; accordingly, the rules regarding Vested Pensions in the prior Agreements are expressly adopted by reference herein.

**7. PAST SERVICE CREDITS.** A Participant may be entitled to Past Service Credits for employment with an employer who is not a Covered Employer if the employer subsequently

becomes a Covered Employer and if the Participant subsequently enters any Covered Employment. A Participant who has previously worked in a non-covered occupational classification for a Covered Employer may also be entitled to Past Service Credits if the Participant subsequently performs Covered Employment and if the Covered Employer subsequently makes contributions for employees in that occupational classification. The following rules shall govern the crediting of Past Service Credits:

**7.1  Maximum Credits.** A Participant shall be entitled to no more than five (5) Past Service Credits.

**7.2  One to One Rule.** Past Service Credits are earned on a one-for-one basis. The Participant shall earn one (1) Past Service Credit for each Year of past service with an employer matched by a subsequent Year of Covered Employment by the Participant. Such Covered Employment need not be with the employer under which the Participant performed the past service. The reference to "Years" in this subsection shall mean (a) a Year in which the Participant performed any employment for Years prior to 1965 and (b) a Year in which the Participant performed employment for three hundred (300) or more Hours of Service for Years in and after 1965. Such Years do not need to be consecutive Years.

**7.3  Covered Employer Requirement.** A Participant shall only earn Past Service Credits if the employer under which the Participant performed the past service subsequently becomes or remains a Covered Employer. Furthermore, the number of Past Service Credits which can be granted to such Participant shall be limited to the number of Years such employer was a Covered Employer as of the date of the Participant's retirement or disability.

**7.4  Occupational Classifications.** Past Service Credits shall not be granted for Years of past service in an occupational classification if the employer does not subsequently contribute to the NEBF on behalf of employees in that classification.

**7.5  Breaks in Service.** Any break in service causing a loss of prior service credits pursuant to Section 8 shall cause a loss of accrued and potential Past Service Credits.

**7.6  Employer Out of Business.** Past Service Credits may be granted where a Participant worked for an employer who went out of business and such business was taken over by a Covered Employer, or other comparable situations, if the Trustees, in their sole discretion, are satisfied on the basis of evidence submitted to them that it is appropriate to treat the Covered Employer as one who has succeeded to the business of the employer who went out of business.

**8. LOSS OF PRIOR BENEFIT AND VESTING SERVICE CREDITS.** A Participant who suffers a break in service under the following rules before becoming entitled to a Vested Pension shall lose prior Benefit Service Credits and Vesting Service Credits, as set forth below, and such lost Benefit Service Credits shall not be considered in computing the Participant's Pension Benefit and such lost Vesting Service Credits shall not be considered in computing a Participant's entitlement to a Vested Pension.

**8.1  Break in Service Rules.** The following breaks in service, except as identified in Section 8.2 and Section 8.3, shall result in a loss of some or all prior Benefit Service Credits and Vesting Service Credits.

**(a) 1947 Through 1975.** A failure to perform Covered Employment, as defined in this subsection, for three (3) consecutive Years from 1947 through 1975 shall result in a loss of all prior Benefit Service Credits and Vesting Service Credits. Prior to 1965, a failure to perform Covered Employment in a Year occurred when a Participant failed to perform any Covered Employment in that Year. From 1965 through 1975, a failure to perform Covered Employment in a Year occurred when a Participant failed to perform work for three hundred (300) or more Hours of Service in Covered Employment in that Year.

**(b) 1976 Through 1984.** Each Year in which a Participant failed to perform work for three hundred (300) or more Hours of Service in Covered Employment from 1976 through 1984 shall result in a loss of one prior Benefit Service Credit and one prior Vesting Service Credit. However, in no event shall a Participant lose any prior Benefit Service Credits or Vesting Service Credits until such Participant fails to perform work for three hundred (300) or more Hours of Service in Covered Employment for a number of consecutive Years equal to the number of accrued Vesting Service Credits.

**(c) 1985 Through Present.** Each Year in which a Participant fails or failed to perform work for three hundred (300) or more Hours of Service in Covered Employment from 1985 through the present shall result in a loss of one prior Benefit Service Credit and one prior Vesting Service Credit. However, in no event shall a Participant lose any prior Benefit Service Credits or Vesting Service Credits until such Participant fails to perform work for three hundred (300) or more Hours of Service in Covered Employment for a total of five (5) consecutive Years.

**8.2  Periods of Time Not Considered a Break in Service.** Certain periods of time in which a Participant is out of Covered Employment because of special circumstances shall not be considered a failure to perform work in Covered Employment and shall not be included in the computation of breaks in service as set forth in Section 8.1. A Participant shall be responsible for proving to the satisfaction of the Trustees that one or more of the following circumstances precluded the performance of Covered Employment:

**(a)** Periods of time in which a Participant is totally disabled. A Participant shall be considered totally disabled, for purposes of this subsection only, if he has become totally incapacitated by bodily injury, sickness or disease so as to be prevented thereby from engaging in his employment classification in Covered Employment.

**(b)** Periods of time in which a Participant is disabled, but less than totally disabled. A Participant shall

be considered disabled, for purposes of this sub-section only, if he is receiving or entitled to receive accident and/or sickness benefits or workmen's compensation.

(c) Periods of time, up to a maximum of six (6) months, during which a Participant is physically able and available to work in Covered Employment, but during which he does not work in Covered Employment because of a strike or lockout.

(d) Periods of time during which a Participant is absent from Covered Employment because such Participant is serving as a full-time employee of a State or National Labor Federation or similar organization in which the Brotherhood or a Local Union is a member or in which the Association or a Local Chapter is a member.

(e) Periods of time in which a Participant is accruing Vesting Service Credits pursuant to Sections 5.4, 5.6, and/or 5.7.

**8.3  Exception for Vested Pension.** Notwithstanding Sections 8.1 and 8.2, a Participant who is entitled to a Vested Pension shall not lose any prior Benefit Service Credits or Vesting Service Credits.

## 9. ELIGIBILITY, AMOUNT, AND METHOD OF PAYMENT OF NORMAL RETIREMENT PENSION BENEFIT.

**9.1  Eligibility.** A Participant who is retired from the electrical industry shall be eligible for a Normal Retirement Pension Benefit upon reaching the Normal Retirement Age of sixty-five (65), if such Participant:

(a) is entitled to a Vested Pension; or
(b) has retained accrued Benefit Service Credits.

**9.2  Amount.** A Participant who retires with such a Normal Retirement Pension Benefit shall be entitled to a monthly Retirement Pension Benefit equal to the sum of the product of each Benefit Service Credit and its applicable pension rate (as delineated in Section 12).

**9.3  Method of Payment.** Unless a Joint and Survivor Annuity Benefit is payable pursuant to Section 16, the monthly Normal Retirement Pension Benefit shall be paid only for the life of the Participant.

## 10. ELIGIBILITY, AMOUNT, AND METHOD OF PAYMENT OF EARLY RETIREMENT PENSION BENEFIT.

**10.1  Eligibility.** A Participant who is retired from the electrical industry shall be eligible for an Early Retirement Pension Benefit upon reaching the early retirement age of sixty-two (62), if such Participant is entitled to a Vested Pension. Further, in some instances, if such Participant would otherwise be eligible for the Nonreduced Early Retirement Pension Benefit as set forth in Section 10.2(a), the Participant shall be eligible for an Early Retirement Pension Benefit upon reaching the age of sixty (60) as set forth in Section 10.2(b).

**10.2  Amount.**

(a) **Nonreduced on or after Age 62.** A Participant who retires with such an Early Retirement Pension Benefit on or after attaining the age of sixty-two (62) shall be entitled to a monthly Retirement Pension Benefit equal to the sum of the product of each Benefit Service Credit and its applicable pension rate (as delineated in Section 12) if, during any one of the seven (7) Years immediately preceding the Participant's effective date of Retirement Pension Benefit (not including the Year in which said effective date occurs), the Participant performed three hundred (300) or more Hours of Service in the following types of employment:

(1) the Participant was employed in Covered Employment;
(2) the Participant was employed in Non-Covered Employment by a Covered Employer; or
(3) the Participant was employed in Non-Covered Employment by a Related Organization.

However, if a Participant retires with an Early Retirement Pension Benefit with an effective date of Retirement Pension Benefit in 1998 or 1999 and has not performed three hundred (300) or more Hours of Service in the types of employment recognized in Section 10.2(a)(1) through (3) in 1993, 1994, 1995, 1996, or 1997 (or 1998 for a 1999 effective date), such Participant shall be entitled to a reduced Early Retirement Pension Benefit calculated as set forth in Section 10.2(c).

(b) **Reduced at Ages 60 and 61.** A Participant who would be eligible for the Nonreduced Early Retirement Pension Benefit set forth in Section 10.2(a) if he applied on or after attaining the age of sixty-two (62), shall be eligible to retire at ages sixty (60) or sixty-one (61) and shall be entitled to a monthly Retirement Pension Benefit equal to the sum of the product of each Benefit Service Credit and its applicable pension rate (as delineated in Section 12) less a monthly reduction of a total of nine and one-fourths percent (9 1/4%) for each year or part thereof the Participant was under the age of sixty-two (62) at the Participant's effective date of Retirement Pension Benefit.

However, Hours of Service earned during the Year in which the effective date of Retirement Pension Benefit occurs shall not be considered in determining whether the Participant would be eligible for the Nonreduced Early Retirement Pension Benefit set forth in Section 10.2(a) if he applied on or after attaining the age of sixty-two (62).

(c) **Reduced on or after Age 62.** A Participant who retires with such an Early Retirement Pension Benefit on or after attaining the age of sixty-two (62) and who was not employed for three hundred (300) or more Hours of Service in any of the types of employment recognized in Section 10.2(a)(1) through (3) in any one of the seven (7) Years immediately preceding the Participant's effective date of Retirement Pension Benefit, shall be entitled to a monthly Retirement Pension Benefit equal to the sum of the product of each Benefit Service Credit and its applicable pension rate (as delineated in Section 12) less a monthly reduction of a total

of six and two-thirds percent (6 2/3%) for each year or part thereof the Participant was under the age of sixty-five (65) at the Participant's effective date of Retirement Pension Benefit.

**10.3** **Method of Payment.** Unless a Joint and Survivor Annuity Benefit is payable pursuant to Section 16, the monthly Early Retirement Pension Benefit shall be paid only for the life of the Participant.

## 11. ELIGIBILITY, AMOUNT, AND METHOD OF PAYMENT OF DISABILITY PENSION BENEFIT.

**11.1 Eligibility.**

(a) **Disabilities Prior to March 1, 1981.** A Participant who becomes disabled, as defined in Section 11.1(c), prior to March 1, 1981, shall be entitled to a Disability Pension Benefit if such Participant meets the following conditions at the time of the occurrence of the disability:

(1) the Participant is less than sixty-five (65) years of age;

(2) the Participant is entitled to a Vested Pension; and

(3) the Participant was employed in any of the types of employment recognized in Section 10.2(a)(1) through (3).

(b) **Disabilities On or After March 1, 1981.** A Participant who becomes disabled, as defined in Section 11.1(c), on or after March 1, 1981, shall be entitled to a Disability Pension Benefit if such Participant meets the following conditions at the time of the occurrence of the disability:

(1) the Participant is less than sixty-five (65) years of age;

(2) the Participant is entitled to a Vested Pension; and

(3) within the five (5) Years immediately preceding the occurrence of the disability, the Participant was employed in any of the types of employment recognized in Section 10.2(a)(1) through (3).

(c) **Disability Defined.** To be entitled to a Disability Pension Benefit, a Participant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve (12) months, provided, however, that any of the following disabilities will not entitle a Participant to a Disability Pension Benefit:

(1) disability which was contracted, suffered or occurred while the Participant was engaged in, or resulted from his having engaged in, a felonious act or enterprise;

(2) disability which was self-inflicted;

(3) disability arising out of, or occurring during, service in the armed forces of any country; or

(4) disability which results in a Participant receiving other disability benefits or workmen's compensation benefits as a result of employment outside of the electrical industry.

Proof of such disability must be filed with the NEBF and shall consist of a Social Security Disability Award or such other proof as the Trustees may require.

**11.2** **Amount.** A Participant who retires with such a Disability Pension Benefit shall be entitled to a monthly Disability Pension Benefit equal to the sum of the product of each Benefit Service Credit and its applicable pension rate (as delineated in Section 12). If, however, a Participant has fewer than twenty (20) Benefit Service Credits, the Participant shall be entitled to a monthly Disability Pension Benefit calculated by multiplying twenty (20) by the pension rate applicable to the Participant's Benefit Service Credits (as delineated in Section 12).

**11.3** **Method of Payment.** Unless a Joint and Survivor Annuity Benefit is payable pursuant to Section 16, the monthly Disability Pension Benefit shall be paid only for the life of the Participant or the term of the disability.

## 12. PENSION CALCULATIONS.

**12.1** **Basic Rule.** For a Participant entitled to a Pension Benefit under Sections 9, 10, or 11, the following pension rates shall be used to calculate such Participant's Pension Benefit (by computing the sum of the product of each Benefit Service Credit and its applicable rate, as referenced in Section 12.3).

**12.2 Pension Rates.**

| | |
|---|---|
| Prior to July 1, 1977 | $7.87 |
| July 1, 1977 through Dec. 31, 1980 | 11.85 |
| Jan. 1, 1981 through Dec. 31, 1982 | 13.16 |
| Jan. 1, 1983 through Dec. 31, 1984 | 14.98 |
| Jan. 1, 1985 through Feb. 28, 1986 | 15.68 |
| Mar. 1, 1986 through Dec. 31, 1986 | 17.63 |
| Jan. 1, 1987 through Dec. 31, 1988 | 18.26 |
| Jan. 1, 1989 through Dec. 31, 1989 | 18.81 |
| Jan. 1, 1990 through Dec. 31, 1990 | 19.29 |
| Jan. 1, 1991 through Dec. 31, 1991 | 20.87 |
| Jan. 1, 1992 through Dec. 31, 1992 | 21.39 |
| Jan. 1, 1993 through Dec. 31, 1993 | 22.51 |
| Jan. 1, 1994 through Nov. 30, 1995 | 23.18 |
| Dec. 1, 1995 through Dec. 31, 1996 | 24.64 |
| Jan. 1, 1997 through Dec. 31, 1997 | 25.71 |
| Jan. 1, 1998 through Dec. 31, 1998 | 27.05 |
| Jan. 1, 1999 through Dec. 31, 1999 | 28.56 |
| Jan. 1, 2000 and Thereafter | 30.00 |

The above pension rates reflect the rates in effect as of the effective date of this Plan. Future amendments to these pension rates and/or the rate under Section 12.3(b), once adopted, may be reflected in an attachment to this Plan document.

**12.3** **Applicable Pension Rate.**

(a) For persons who are not receiving a Pension Benefit as of the effective date of this Plan, the pension rate applicable to their Benefit Service Credits shall be as follows:

6

**(1)** For persons who have, subsequent to the accrual of Benefit Service Credits and prior to January 1, 1993, not worked for three hundred (300) or more Hours of Service in Covered Employment for three (3) or more consecutive Years, the pension rate applicable to each of the prior accrued Benefit Service Credits shall be the rate in effect at the end of said three (3) Year period. The periods of time described in Section 8.2 shall be considered to be employment in Covered Employment for purposes of this subsection.

**(2)** For persons who have accrued Benefit Service Credits without a three (3) Year break as defined in Section 12.3(a)(1) or who have accrued Benefit Service Credits subsequent to such three (3) Year break, but who have, subsequent to the accrual of Benefit Service Credits and subsequent to January 1, 1993 but prior to January 1, 1998, not worked for three hundred (300) or more Hours of Service in Covered Employment for five (5) or more consecutive Years, the pension rate applicable to each of those accrued Benefit Service Credits shall be the rate in effect at the end of said five (5) Year period. The periods of time described in Section 8.2 shall be considered to be employment in Covered Employment for purposes of this subsection.

**(3)** For persons who have accrued Benefit Service Credits without a three (3) Year break as defined in Section 12.3(a)(1) or a five (5) Year break as defined in Section 12.3(a)(2), or who have accrued Benefit Service Credits subsequent to such three (3) or five (5) Year break, but who have, subsequent to the accrual of Benefit Service Credits and subsequent to January 1, 1998, not worked for three hundred (300) or more Hours of Service in Covered Employment for seven (7) or more consecutive Years, the pension rate applicable to each of those accrued Benefit Service Credits shall be the rate in effect at the end of said seven (7) Year period. The periods of time described in Section 8.2 shall be considered to be employment in Covered Employment for purposes of this subsection.

**(4)** For persons who have accrued Benefit Service Credits without a three (3) Year break as defined in Section 12.3(a)(1), without a five (5) Year break as defined in Section 12.3(a)(2), or without a seven (7) Year break as defined in Section 12.3(a)(3), or who have accrued Benefit Service Credits subsequent to such three (3), five (5) or seven (7) Year break, the pension rate applicable to each of those accrued Benefit Service Credits shall be the rate in effect on the effective date of the Participant's Pension Benefit (as set forth in Section 13).

**(b)** For persons who began receiving a Pension Benefit prior to the effective date of this Plan, their Pension Benefit shall be adjusted upward, if applicable, by recomputing their Pension Benefit using the rates as revised applicable to the date or dates previously used when their original Pension Benefit was computed. Notwithstanding the above, for persons who began receiving a Pension Benefit prior to January 1, 1965, their Pension Benefit shall be one hundred thirty dollars and thirty-nine cents ($130.39) per month.

**12.4** **Less than 3%.** The pension rates set forth above shall apply to a Participant whose last Covered Employer contributed 3% of the gross labor payroll paid to, or accrued by, the Participant to the NEBF. If the Participant's last Covered Employer contributed on behalf of the Participant at a rate less than 3%, the pension rate applicable to such Participant shall be one-half (1/2) the rate set forth in Section 12.2. Notwithstanding the above, if the Covered Employer agreed to contribute at the 3% level subsequent to the Participant's retirement, the Participant's Pension Benefit shall be computed using a rate that is one-half (1/2) the highest pension rate effective the first month in which such Covered Employer commenced contributions at the 3% level.

**13. EFFECTIVE DATE OF PENSION BENEFITS**. The effective date of the Pension Benefit is the date for which the Participant first receives a benefit. The following rules shall govern the effective date of the Participant's Pension Benefit.

**13.1** **Normal Retirement Pension Benefit.** The effective date of the Normal Retirement Pension Benefit shall be the later of:

**(a)** the month following the receipt of the Participant's pension application;

**(b)** the month following the Participant's sixty-fifth (65th) birthday; or

**(c)** the month following the Participant's retirement from the electrical industry.

However, the effective date of the Normal Retirement Pension Benefit for any Participant who files an application for a Normal Retirement Pension Benefit and who is already retired from the electrical industry and age sixty-five (65) or older, shall be no later than sixty (60) days after December 31 of the Year in which the Participant attained the age of sixty-five (65) or retired from the electrical industry, whichever occurs later.

**13.2** **Early Retirement Pension Benefit.** The effective date of the Early Retirement Pension Benefit shall be the later of:

**(a)** the month following the receipt of the Participant's pension application;

**(b)** the month following the Participant's sixty-second (62nd) birthday; or

**(c)** the month following the Participant's retirement from the electrical industry.

**13.3** **Disability Pension Benefit.** The effective date of the Disability Pension Benefit shall be as follows:

**(a)** For disabilities occurring prior to June 30, 1987, the effective date shall be six (6) months following the occurrence of the disability; or

(b) For disabilities occurring on or after June 30, 1987, the effective date shall be the month following the date of the disability.

**13.4   Retroactive Payments.** All Retirement Pension Benefits and Disability Pension Benefits that are paid retroactively under the rules set forth in this Section shall be paid without interest.

## 14.   COMMENCEMENT OF THE PAYMENT OF PENSION BENEFITS.

**14.1   Retirement Pension Benefits.**   Payment of Retirement Pension Benefits shall commence the month following the month in which the Trustees approve the Retirement Pension Benefit.

**14.2   Disability Pension Benefits.**   Payment of Disability Pension Benefits shall commence the month following the month in which the Trustees approve the Disability Pension Benefit.

**14.3   Age 70 1/2.**   Notwithstanding any other provision of this Plan, and regardless of whether the Participant continues working in Covered Employment, distribution of Retirement Pension Benefits shall commence no later than April 1 of the Year following the Year in which such Participant attains the age of seventy and one-half (70 1/2), in accordance with Section 401(a)(9) of the Code and the Treasury Regulations promulgated thereunder.

## 15.   RETURN TO WORK.

**15.1   Suspension of Retirement Pension Benefits.**   A Participant who is receiving a Retirement Pension Benefit and who subsequently completes forty (40) or more Hours of Service in any calendar month in the electrical industry, at a trade or craft in which the Participant was employed at any time while covered by the NEBF, and within the geographic area covered by the NEBF, shall have his monthly Retirement Pension Benefit suspended for that month and any subsequent month in which the Participant completes forty (40) or more such Hours of Service.  In such event, payment of Retirement Pension Benefits shall be suspended until the Participant advises the Trustees in writing that he is no longer so employed.  Every Participant receiving payment of Retirement Pension Benefits must advise the Trustees in writing of any such employment which exceeds forty (40) or more Hours of Service in any calendar month.  If a Participant fails to so notify the Trustees and the Trustees become aware that such Participant is employed in the manner described above, the Trustees may act on the basis of a rebuttable presumption that the Participant has completed forty (40) or more Hours of Service for that month and suspend payment of Retirement Pension Benefits for such month.  A Participant who works as an instructor in an apprenticeship program recognized by the Association and the Brotherhood or as an electrical inspector for a governmental authority, where such instructors or electrical inspectors are not contributed upon, shall not have his monthly Retirement Pension Benefit suspended due to such work.

**15.2   Return to Employment While on Disability.**   A Disability Pension Benefit shall cease at the close of the last day of the month preceding the day:

(a) upon which a Participant who has been receiving a Disability Pension Benefit returns to any substantial gainful employment, if the Trustees, in their discretion, make a determination that the Participant is no longer disabled, as defined in Section 11.1(c); or

(b) upon which the Trustees make a determination on the basis of proof that the Participant is no longer disabled, as defined in Section 11.1(c).

**15.3   Subsequent Application for Benefits.**

(a) A Participant who has had his Retirement Pension Benefit suspended pursuant to Section 15.1, upon his subsequent retirement, shall receive the same Retirement Pension Benefit which he received prior to the suspension plus any additional Retirement Pension Benefit he may be entitled to because he has accrued additional Benefit Service Credits. Such Participant's Retirement Pension Benefit shall be similarly recomputed each time he returns to Covered Employment and subsequently retires.

(b) A Participant whose Disability Pension Benefit was terminated pursuant to Section 15.2 shall:

(1) in the event he subsequently applies and is determined to be eligible for a Disability Pension Benefit as a result of the same disability, or the recurrence or continuation of the same disability, receive the same Disability Pension Benefit which he received prior to the termination plus any additional Disability Pension Benefit he may be entitled to because he has accrued additional Benefit Service Credits, however, if the additional Benefit Service Credits combined with the prior earned Benefit Service Credits do not exceed twenty (20), he shall not be entitled to accrue additional Benefit Service Credits, and if the additional Benefit Service Credits combined with the prior earned Benefit Service Credits do exceed twenty (20), he shall not be entitled to combined Benefit Service Credits in excess of the number actually earned; or

(2) in the event he subsequently applies and is determined to be eligible for a Disability Pension Benefit based on a different disability or for a Retirement Pension Benefit, receive a Disability or Retirement Pension Benefit based upon his accrued Benefit Service Credits and the pension rate, as defined in Section 12, applicable to those Benefit Service Credits without regard to the amount of Disability Pension Benefits previously received.

(c) A Participant's Hours of Service of Covered Employment performed prior to the effective date of the original Retirement Pension Benefit or Disability Pension Benefit shall not be used to compute any subsequent Benefit Service Credits under Sections 15.3(a) or 15.3(b)(1).

## 16.   JOINT AND SURVIVOR ANNUITY BENEFIT.

**16.1   Eligibility for Joint and Survivor Annuity Benefit.** A Participant who retires under a Disability Pension

Benefit or Retirement Pension Benefit shall receive monthly Pension Benefits for the period of his life or the period of his disability only, unless the Pension Benefit is payable as a Joint and Survivor Annuity Benefit under this Section.

**(a) Retirement Pension Benefit.** A Participant who (1) retires under a Normal or Early Retirement Pension Benefit, (2) has had at least one Hour of Service in Covered Employment on or after September 1, 1974, and (3) is survived by a spouse to whom he has been legally married throughout the one year period ending at the effective date of the Participant's Retirement Pension Benefit, shall, except as provided in Section 16.2, be paid a reduced monthly Retirement Pension Benefit in the form of a Joint and Survivor Annuity Benefit. Notwithstanding the above, a Participant and spouse who marry within the one year prior to the effective date of the Participant's Retirement Pension Benefit and who have been married for at least a one year period ending on or before the date of the Participant's death shall be treated as having been married throughout the one year period ending at the effective date of the Participant's Retirement Pension Benefit.

**(b) Disability Pension Benefit.** A Participant who (1) becomes disabled on or after January 1, 1985 and who retires under a Disability Pension Benefit, and (2) is survived by a spouse to whom he has been legally married throughout the one year period ending at the commencement date of the Participant's Disability Pension Benefit, shall, except as provided in Section 16.2, be paid a reduced monthly Disability Pension Benefit in the form of a Joint and Survivor Annuity Benefit. Notwithstanding the above, a Participant and spouse who marry within the one year prior to the commencement date of the Participant's Disability Pension Benefit and who have been married for at least a one year period ending on or before the date of the Participant's death shall be treated as having been married throughout the one year period ending at the commencement date of the Participant's Disability Pension Benefit.

**16.2   Election Against Joint and Survivor Annuity Benefit.** A Participant shall be paid his regular Disability or Retirement Pension Benefit for his life or for the term of the disability only, if such Participant, who meets the eligibility requirements of Sections 16.1(a) or 16.1(b), elects not to receive the Joint and Survivor Annuity Benefit and either the Participant's spouse consents in writing to such election or it is established to the satisfaction of the Trustees that such consent cannot be obtained because the Participant has no spouse, because the Participant's spouse cannot be located, or because of such other circumstances as the Secretary of the Treasury by regulations may prescribe. Such election shall be made within the ninety (90) day period prior to the effective date of the Participant's Retirement Pension Benefit or prior to the commencement date of the Participant's Disability Pension Benefit and may be changed at any time and any number of times

during such period. After the Participant has cashed his first Pension Benefit payment, such election cannot be made or cannot be revoked, as the case may be.

**16.3   Amount and Payment of Joint and Survivor Annuity Benefit.**

**(a) Amount of Joint and Survivor Annuity Benefit.**

**(1)** A Participant's regular Retirement Pension Benefit shall be computed and then reduced by nine and three-fourths (9 3/4) percentage points plus or minus the following percentage points based on the difference between the Participant's and the spouse's ages. The nine and three-fourths (9 3/4) percentage points' reduction is (i) further reduced by one-half (1/2) percentage point for each year or part thereof that the Participant's spouse is younger than the Participant or (ii) increased by one-half (1/2) percentage points for each year or part thereof that the Participant's spouse is older than the Participant.

**(2)** A Participant's regular Disability Pension Benefit shall be computed and then reduced by nine and three-fourths (9 3/4) percentage points plus or minus the following percentage points based on the number of years the Participant's spouse is under or over the age of sixty-five as of the effective date of the Disability Pension Benefit. The nine and three-fourths (9 3/4) percentage points' reduction is (i) further reduced by one-half (1/2) percentage point for each year or part thereof that the Participant's spouse is under the age of sixty-five (65) as of the effective date of the Disability Pension Benefit, or (ii) increased by one-half (1/2) percentage points for each year or part thereof that the Participant's spouse is over the age of sixty-five (65) as of the effective date of the Disability Pension Benefit.

**(b) Payment.** A Participant whose Pension Benefit is paid in the form of a Joint and Survivor Annuity Benefit shall receive the reduced monthly Pension Benefits as set forth in Section 16.3(a) from the date of the commencement of the Pension Benefit until the month of his death. As of the month following the month of the Participant's death, if the Participant's spouse survives the Participant, such spouse shall commence receiving one-half (1/2) of the Joint and Survivor Annuity Benefit which had been previously payable to the Participant until the month of the surviving spouse's death. Notwithstanding the above, for any Participant who is receiving a Pension Benefit in the form of a Joint and Survivor Annuity Benefit and whose spouse is still alive as of July 1, 1998, and for any Participant who commences receiving a Pension Benefit in the form of a Joint and Survivor Annuity Benefit on or after July 1, 1998, in the event the Participant's spouse predeceases the Participant, the Participant shall thereafter be paid his regular Pension Benefit rather than the reduced Joint and Survivor Annuity Benefit. This regular Pension Benefit shall be effective as of the first day of the month

following the death of the spouse. Furthermore, for these same Participants, if the Participant and the spouse shall become divorced on or after July 1, 1998, and the divorce decree or qualified domestic relations order provides that the spouse is no longer eligible for the Joint and Survivor Annuity Benefit, the Participant shall thereafter be paid his regular Pension Benefit rather than the reduced Joint and Survivor Annuity Benefit. This regular Pension Benefit shall be effective as of the first day of the month following the divorce.

## 17. PRE-RETIREMENT SURVIVING SPOUSE BENEFIT.

**17.1   Death On or After Age 62.**  If a participant (a) dies after August 23, 1984, after attaining the age of sixty-two (62), but before applying for and receiving Pension Benefits (including Disability Pension Benefits), (b) is entitled to a Vested Pension, (c) had at least one Hour of Service in Covered Employment on or after September 1, 1974, and (d) is survived by a spouse to whom he has been legally married throughout the one year period ending at the time of his death, such surviving spouse shall be entitled to certain reduced monthly benefits for the surviving spouse's life. Such surviving spouse shall commence receiving monthly benefits as of the month following the month of the Participant's death in the amount of one-half ($\frac{1}{2}$) of the monthly Pension Benefit the Participant would have been entitled to had he commenced receiving a Joint and Survivor Annuity Benefit on the date prior to his death. The monthly benefit payable to such spouse shall be payable until the month of the surviving spouse's death.

Notwithstanding the above reference to death after age 62, for a Participant who would be eligible for the Reduced Early Retirement Pension Benefit at ages sixty (60) or sixty-one (61), as set forth in Section 10.2(b), but who dies after attaining the age of sixty (60), the surviving spouse shall be eligible to commence receiving monthly benefits, based on the rate set forth in Section 10.2(b) and as set forth above, as of the month following the month of the Participant's death.

**17.2   Death Prior to Age 62.**  If a Participant (a) dies after August 23, 1984, before attaining the age of sixty-two (62), and before applying for and receiving Pension Benefits (including Disability Pension Benefits), (b) is entitled to a Vested Pension, (c) had at least one Hour of Service in Covered Employment on or after September 1, 1974, and (d) is survived by a spouse to whom he has been legally married throughout the one year period ending at the time of his death, such surviving spouse shall be entitled to certain reduced monthly benefits for the surviving spouse's life. Such surviving spouse shall commence receiving monthly benefits as of the month following the date the Participant would have attained the age of sixty-two (62) in the amount of one-half ($\frac{1}{2}$) of the monthly Pension Benefit if the Participant would have been entitled to had he retired from the electrical industry on the date of his death, survived to age sixty-two (62), and commenced receiving a Joint and Survivor Annuity Benefit the month after he attained the age of sixty-two (62). The monthly benefit payable to such spouse shall be payable until the month of the surviving spouse's death.

Notwithstanding the above reference to death prior to age 62, for a Participant who would be eligible for the Reduced Early Retirement Pension Benefit at ages sixty (60) or sixty-one (61), as set forth in Section 10.2(b), but who dies prior to attaining the age of sixty (60), the surviving spouse shall be eligible to commence receiving monthly benefits, based on the rate set forth in Section 10.2(b) and as set forth above, as of the month following the date the Participant would have attained the age of sixty (60).

**18. MAXIMUM BENEFIT.**  Notwithstanding any other provision of this Plan, the annual Pension Benefit payable to any Participant in any Year shall not exceed the maximum amount permitted under Section 415 of the Code.

**19. CONSTRUCTION AND DETERMINATIONS WITH REGARD TO PLAN.**  The Trustees shall have full discretionary power and authority to construe and interpret the provisions of this Plan, the terms used herein, and the rules, regulations, and policies related thereto. The Trustees shall have full, discretionary, and exclusive power and authority to administer the Plan and to determine all questions of coverage and eligibility, methods of providing or arranging for the benefits specified in this Plan and all other related matters. The Trustees shall not be under any obligation to pay any Pension Benefit if the payment of such Pension Benefit will result in loss of the NEBF's tax exempt status or qualified status under the applicable Federal Tax Law. Any such determination and any such construction or interpretation issued or confirmed in writing by the Trustees shall be final and binding upon the Brotherhood, the Association, the National Board, Local Unions, Local Chapters, Covered Employers, and Participants and Beneficiaries and their families, dependents and/or legal representatives. Constructions or interpretations which are not issued or confirmed in writing by the Trustees shall not be binding upon the NEBF, and, in particular, no matter respecting the Trustees' rights herein or any difference arising thereunder shall be controlled or determined by the grievance or arbitration procedure established in any local collective bargaining agreement or by any construction or determination by local collective bargaining parties. The Trustees shall delegate to the Executive Secretary-Treasurer the authority to make the initial determination of an applicant's eligibility for Pension Benefits subject to the applicant's right of appeal under Section 20.4 of this Plan.

## 20. CLAIMS PROCEDURES.

**20.1   Application.**  A timely application for Pension Benefits should be submitted to the business address of the NEBF's administrative offices, now located at 2400 Research Boulevard, Suite 500, Rockville, Maryland 20850-3266. The application must be submitted on a printed application which may be obtained from the NEBF, a Local Union, a Local Chapter, or the Brotherhood. When the application is submitted, the applicant should make certain he completes the form which permits the NEBF to obtain certain information from

the Social Security Administration. The applicant will be required to submit proof of age, such as a birth certificate, with the application. In addition, the applicant must submit proof of age of his spouse and proof of marriage in order for Pension Benefits to be payable as a Joint and Survivor Annuity Benefit. This information may be necessary to determine if the applicant is entitled to a Pension Benefit, and the amount of the Pension Benefit to be paid.

20.2 **Processing of Application.** When the NEBF receives a completed application, the Executive Secretary-Treasurer will make a decision as to whether the applicant is eligible for Pension Benefits, and if so, the amount of Pension Benefits to be paid, within ninety (90) days after receiving the application, if possible. However, inasmuch as the NEBF may require the assistance of the Social Security Administration in order to determine eligibility for and amounts of Pension Benefits, the NEBF may not have full information during said ninety (90) day period. In that event, the applicant will be notified during the ninety (90) day period that an extension of time is necessary and the circumstances requiring the extension. The NEBF will have an additional ninety (90) days in which to make a determination of eligibility and amount of Pension Benefits due. If, at the end of the total one hundred eighty (180) day period, the NEBF still has been unable to process the necessary information, the NEBF will make a decision as soon as possible. However, the applicant may, if he so desires, consider that his application has been denied and submit an appeal.

20.3 **Denial of Application.** If any application for Pension Benefits is wholly or partially denied by the Executive Secretary-Treasurer, written notice of the denial of Pension Benefits will be sent to the applicant within the period described above. The notice will state the specific reason or reasons for the denial and will also explain the time limits and procedures for appealing the denial of Pension Benefits.

20.4 **Appeal.** The applicant shall be entitled to request that the Trustees reconsider his application by filing with the NEBF a written request for appeal within sixty (60) days after the denial of Pension Benefits. All appeals should be submitted to the Trustees at the business address of the NEBF's administrative offices. The appeal should contain a written statement of the reasons why the applicant believes his application should be approved, and any other additional information the applicant believes may be helpful. The applicant may also, upon written request, receive copies of all NEBF documents relating to the denial of his application or the determination of the amount of his Pension Benefits.

20.5 **Decision on Appeal.** A final decision as to the denial or approval of the appeal shall be made by the Trustees no later than sixty (60) days after receipt of the appeal unless special circumstances require an extension of time. In the event an extension of time is necessary, written notice of the extension shall be provided to the applicant within sixty (60) days after the appeal is received. The notice shall explain the reasons for the extension. In that event, the Trustees shall have an

additional sixty (60) days to render their decision on the appeal. The decision denying or approving the applicant's appeal shall include specific reasons for the decision. The decision of the Trustees shall be final and binding.

21. **RULES, REGULATIONS, AND POLICIES.** Pursuant to the Agreement, the Trustees are empowered and authorized to promulgate, adopt and thereafter amend or rescind any and all necessary rules, regulations, or policies which they deem needed or desirable to facilitate the proper administration of the NEBF and the Plan. All such rules, regulations or policies adopted by action of the Trustees shall be binding upon the Brotherhood, the Association, the National Board, Local Unions, Local Chapters, Covered Employers, and Participants and Beneficiaries and their families, dependents and/or legal representatives.

22. **CONTRIBUTIONS.**

22.1 **Payment of Contributions.** All contributions made by Covered Employers to the NEBF shall be made in accordance with the Agreement. No contributions shall be permitted by Participants.

22.2 **Refund of Contributions.** The NEBF will refund mistaken Covered Employer contributions that were paid to the NEBF within the year prior to the date the Trustees first became aware that the contributions were made in error. Contributions paid to the NEBF more than one year prior to the date the Trustees first became aware that the contributions were made in error shall not be refundable.

23. **LIMITATIONS UPON BENEFICIAL RIGHTS AND INTERESTS.** No Participant, Beneficiary, Covered Employer, Local Union, or other person shall have any vested interest or right, title, or other interest in or to the NEBF or any part thereof or any property of the NEBF, except as may be required by the Act, be provided by the Trustees, or be specifically provided for in this Plan. There shall be no pro rata or other distribution of any of the assets of the NEBF for any purpose or reason, except as required by law, as a result of any Local Union, Covered Employer or group of Covered Employers, Participants, or their Beneficiaries, ceasing their participation in the NEBF. Except as required by law or pursuant to a qualified domestic relations order (a "QDRO") as defined in the Act and the Code, all benefits shall be free from the interference and control of any creditor, and no benefits shall be subject to any assignment or other anticipation, nor to seizure or to sale under any legal, equitable or any other process, and in the event that any claim or benefit shall, because of any debt incurred by or resulting from any other claim or liability against any Participant or Beneficiary, by reason of any sale, assignment, transfer, encumbrance, anticipation or other disposition made or attempted by said Participant or Beneficiary, or by reason of any seizure or sale or attempted sale under any legal, equitable or other process, or in any suit or proceeding become payable, or be liable to become payable to any person other than the Participant or Beneficiary for whom the same is intended, as provided herein and pursuant hereto, the Trustees shall have power to withhold payment of such benefit to such Participant or Beneficiary until such assignment, transfer, encumbrance, anticipation or other disposition, writ or legal process is canceled or withdrawn in such manner as shall be satisfactory to the Trustees. Until so canceled or withdrawn, the Trustees shall have the right to use and apply the benefits as the Trustees may deem best, directly for the support and maintenance of such Participant or Beneficiary.

**24. WITHHOLDING PAYMENT.** In the event any question or dispute shall arise as to the proper person or persons to whom any payments shall be made hereunder, the Trustees may withhold such payment until there shall have been made an adjudication of such question or dispute which is satisfactory to the Trustees, or until the Trustees shall have been fully protected against loss by means of such indemnification agreement or bond as they determine to be adequate.

**25. OVERPAYMENTS AND MISTAKEN PAYMENTS.** To the extent permitted by law, in the event the NEBF pays Pension Benefits to a person who is deceased or to a person who is not eligible for such payment, or in the event the NEBF pays a Pension Benefit in excess of the amount owed, the overpayments or mistaken payments shall be a debt due and owing the NEBF from the person who received such payment and/or his estate. The Trustees are authorized, in their discretion, to deduct such overpayments or mistaken payments from any Pension Benefits payable or paid, insofar as such deduction is permitted by law.

**26. ANTI-REVERSION PROVISION.** It shall be impossible at any time for any part of the NEBF to revert to the Covered Employers, or to be used for, or diverted to, any purpose other than the exclusive benefit of Participants and Beneficiaries.

**27. NO DIVESTITURE.** No Participant entitled to any benefit under this Plan shall be divested for any reason, except as allowed by law.

**28. TERMINATION OR MERGER OF NEBF.** In the event of termination or partial termination of the NEBF, as defined by law, a Participant's rights to benefits accrued to the date of termination or partial termination shall be non-forfeitable.

**29. GENDER AND PLURAL USAGES.** Whenever any words are used in this Plan in the masculine gender, they shall also be construed to include the feminine or neuter gender in all situations where they would so apply and wherever any words are used in the plural, they shall also be construed to include the singular.

**30. SECTION TITLES.** The Section titles are included solely for convenience and shall, in no event, be construed to affect or modify any part of the provisions of this Plan or be construed as part thereof.

**31. SAVINGS CLAUSE.** Should any provision of this Plan or in the rules, regulations, or policies adopted by the Trustees be held to be unlawful or invalid, or unlawful or invalid as to any person or instance, such fact shall not adversely affect the other provisions herein or therein contained or the application of said provisions to any other person or instance, unless such unlawfulness or invalidity shall make impossible the functioning of the NEBF, and in such case the appropriate parties shall as quickly as practicable adopt a new provision to take the place of the unlawful or invalid provision.

**32. AMENDMENT OF PLAN.** The Trustees are authorized to amend the Plan, prospectively or retroactively, where they deem it necessary to maintain the continuation of the NEBF's tax exempt status or the Plan's qualified status under Federal Tax Law or to otherwise preserve compliance with the Act or other applicable law, and any regulations or rulings issued with respect thereto. The Trustees and the National Board are also generally authorized to amend the Plan, except where expressly limited as provided herein. No amendment shall have the effect of retroactively depriving Participants or Beneficiaries of rights already accrued under this Plan. Amendments with regard to increases in Pension Benefits may only be made jointly by the Trustees and the National Board and, at the time of the adoption of the amendment, a report by the NEBF's actuary must indicate that in the actuary's opinion (a) no withdrawal liability then exists, and (b) upon its effective date, the amendment will not produce withdrawal liability for any Covered Employer. Withdrawal liability, as used herein, shall mean the circumstances whereby a withdrawing Covered Employer would actually incur withdrawal liability to the NEBF under the Act (and, more particularly, the provisions added by the Multiemployer Pension Amendments Act of 1980).

**33. APPLICABLE PLAN OR AGREEMENT.** A Participant who is receiving a Pension Benefit or whose effective date of the Pension Benefit is prior to the effective date of this Plan, shall be governed by the Agreement and the rules, regulations, and/or policies in effect at the date of the receipt of the Pension Benefit or the effective date of the Pension Benefit, except as specifically provided herein.